**UNITED STATES v. TOMOYA KAWAKITA.**

**No. 19665.**

United States District Court
S. D. California, C. D.

Nov. 1, 1950.

Judgment Affirmed June 22, 1951.

James M. Carter, Cameron L. Lillie, Los Angeles, Cal., for plaintiff.

Morris Lavine, Los Angeles, Cal., for defendant.

MATHES, District Judge.

The defendant was charged with the crime of treason against the United States by indictment returned November 14, 1947. Fourteen overt acts of treason, identified in the indictment as "(a)" to "(n)" inclusive, were alleged to have been committed by the defendant in Japan.

Trial by jury opened on June 18, 1948 and concluded some ten weeks later on September 2, 1948. The jury were unable to reach unanimous agreement as to overt acts (e), (f), (h), (l) and (o), but found the defendant guilty as to overt acts (a), (b), (c), (d), (g), (i), (j) and (k). Overt act (m) was withdrawn upon the Government's motion at the close of the case in chief; overt act (n) was ordered withdrawn from consideration by the jury upon defendant's motion for acquittal pursuant to Rule 29(a) Fed.Rules Crim.Proc. 18 U.S. C.A.

The defendant now moves for judgment of acquittal, including in the alternative a motion for a new trial as permitted by Rule 29(b) Fed.Rules Crim.Proc. This alternative motion is based upon thirty-five separate grounds. The defendant also presents a motion in arrest of judgment under Rule 34 Fed.Rules Crim.Proc. upon the thirty-five grounds set forth in the motion for acquittal and eleven additional grounds.

Only three of these grounds merit discussion here. The first is: "The court erred in instructing the jury as to dual citizenship."

On this subject the jury were instructed as follows:

826

"It is stipulated here that the defendant was born at Calexico, California, on September 26, 1921, and thus became a born citizen of the United States.

"Every born citizen and every naturalized citizen is termed a 'national of the United States.' The term 'national' includes all persons owing permanent allegiance to the United States [8 U.S.C.A. § 501(a), (b)].

"The phrase 'permanent allegiance' refers to the duty of loyalty and obedience which every American citizen owes 'to defend the Constitution and laws of the United States against all enemies, foreign and domestic,' so long as he or she remains a citizen of the United States.

"The terms 'citizen,' 'subject' and 'national' are used interchangeably in this case to denote a member of a sovereign state or nation who owes allegiance to such state or nation in return for protection received from such state or nation.

"It is stipulated that the defendant's parents were born in Japan, and by reason thereof have always been Japanese nationals or subjects owing allegiance to Japan.

"According to the law of Japan, the defendant himself, by reason of his Japanese parentage, was from birth a Japanese national or subject owing allegiance to Japan.

"This conflict in the laws of the two countries gives rise to what is sometimes called 'dual' nationality or citizenship; which means, as applied to this case, that the defendant became an American citizen upon birth, according to our law, because born in the United States; and also, became a Japanese national upon birth, according to Japanese law, because of his Japanese parentage.

"Under our law, any American citizen of alien parentage may, on becoming of age, renounce his American citizenship and thus become a citizen of only the country of his parents.

"The question for you to determine on this phase of the case from all the evidence is whether or not at any time prior to or during the period specified in the indictment, the defendant did renounce or abandon his American citizenship.

"Questions as to whether or not a person is an American citizen and his or her duty of allegiance as such are determined in accordane with the law of the United States. But whenever our laws incorporate by reference or adopt the laws of another country, the foreign law thus adopted is to be considered the same as if a part of the law of the United States. What the foreign law is—in this case the law of Japan —is a question of fact to be determined by the jury from the evidence, the same as any other question of fact.

\*     \*     \*     \*     \*     \*

"Under our law an American citizen cannot owe 'permanent allegiance' to more than one country at any given time. That is to say, it is legally impossible for any American citizen to owe conflicting allegiance to any other country so long as he or she remains a citizen of the United States.

"However, our law declares the right of expatriation to be 'a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness \* \* \*.' [8 U.S. C.A. § 800].· Expatriation is the voluntary renunciation of one's citizenship—a voluntary act done with intent to renounce or forswear allegiance to the country of one's birth.

"In order then to be relieved of the duty of allegiance imposed by American citizenship, one must do some voluntary act of renunciation or abandonment of American nationality and allegiance. And it is the policy of our law to permit free exercise of the right of expatriation by all American citizens everywhere."

The defendant urges that: "Persons residing in Japan who have \* \* \* dual citizenship of both the United States and Japan, are \* \* \* called upon while in Japan to respond to that country's call of loyalty."

█ He obviously refers to what is recognized in our law as temporary allegiance, i. e., the duty of every person to obey the local laws of the country where he may happen to be. As Mr. Justice Field put it in Carlisle v. United States, 1872, 16 Wall. 147, 83 U.S. 147, 154–155, 21 L.Ed. 426;

"By allegiance is meant the obligation of fidelity and obedience which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives. It may be an absolute and permanent obligation, or it may be a qualified and temporary one. The citizen or subject owes an absolute and permanent allegiance to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. The alien, whilst domiciled in the country, owes a local and temporary allegiance, which continues during the period of his residence." (cf. Rex v. Joyce, 173 L.T. 377 (1945), aff'd sub nom. Joyce v. Director of Public Prosecutions, [1946] A.C. 347.)

For any conduct required of him by the laws of Japan, the defendant at bar was unequivocally excused by an instruction to the jury that: "As to any overt act * * * which you may find to have been committed by the defendant, if you further find that the defendant did not do the act * * * willingly or voluntarily, but so acted only because performance of the duties of his employment required him to do so or because of other coercion or compulsion, you must acquit the defendant."

And as added safeguard the jury were further instructed: "You have been cautioned that this is not a so-called 'war crimes' trial—that the defendant is not on trial for maltreatment or deprivations suffered by American prisoners of war. It is not charged here that mistreatment or even cruelty to prisoners of war alone, if such occurred, constitutes the crime of treason. Nor is it claimed that the defendant is responsible for the conditions which existed generally in any Japanese prisoner of war camp. The defendant is not here sought to be charged with responsibility for any acts of others."

The next contended ground of the motions which merits discussion is that the court erred in instructing the jury that § 401 of the Nationality Act of 1940, 8 U.S.C.A. § 801, specifies the exclusive methods whereby a born American citizen can exercise the right of expatriation, and thus lose American nationality or citizenship.

The instructions [1] on this phase of the case were as follows:

"In 1940 the Congress enacted and the President approved an act 'to revise and codify the nationality laws of the United States into a comprehensive nationality code' known as the Nationality Act of 1940.

"The Nationality Act of 1940 has been in effect since January 13, 1941.

"Prior to the effective date of the Nationality Act of 1940, our law provided that any American citizen could expatriate himself by doing any voluntary act which evidenced an intent to renounce or abandon American nationality and allegiance; but our law further provided: 'That no American citizen shall be allowed to expatriate himself when this country is at war' [34 Stat. 1228].

"When the Nationality Act of 1940 became effective, those provisions of our law were repealed; and at all times since January 13, 1941, American citizens have been permitted to expatriate themselves during wartime, but only in the manner provided by treaty or by the provisions of the Nationality Act of 1940.

"Section 401 of the Nationality Act of 1940 [8 U.S.C.A. § 801], in effect since January 13, 1941, provides that:

"'A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"'(a) Obtaining naturalization in a foreign state * * *; or

"'(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"'(c) Entering, or serving in, the armed forces of a foreign state * * * if he has or acquires the nationality of such foreign state; or

"'(d) Accepting, or performing the duties of, any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible; or

1. For full text of instructions, see 96 F.Supp. 837.

" '(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory; or

" '(f) Making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State; or

" '(g) Deserting the military or naval forces of the United States in time of war, provided he is convicted thereof by court martial * * *; or

" '(h) Committing any act of treason against, or attempting by force to overthrow or bearing arms against the United States, provided he is convicted thereof by a court martial or by a court of competent jurisdiction; or

" '(i) making in the United States a formal or written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense; or

" '(j) Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the land or naval forces of the United States.'

"Subsection (i) was added to § 401 on July 1, 1944; and subsection (j) was added on September 27, 1944. So subsections (i) and (j) did not become effective until the dates just stated.

"Any American citizen who does voluntarily any of the acts set forth in § 401, which I have just read, is thereby expatriated and thus loses his or her American citizenship. Our law presumes that such action, voluntarily taken, evidences an intent to renounce, or abandon allegiance to the United States, and with it of course American citizenship and all rights pertaining thereto.

&ast; &ast; &ast; &ast; &ast; &ast;

"Section 408 of the Nationality Act of 1940 [8 U.S.C.A. § 808] provides in substance that 'loss of nationality * * * shall result solely from the performance by a national of the acts' specified in § 401 which I have read to you. Section 410 provides that nothing in the Nationality Act of 1940 'shall be applied in contravention of the provisions of any treaty or convention to which the United States is a party upon October 14, 1940.' There was no treaty or convention between the United States and Japan in effect October 14, 1940, which made any provision with respect to citizenship or expatriation.

"As applied to this case, then, § 408 means that the acts specified from time to time in § 401 are the sole and exclusive methods whereby a born American citizen can exercise the right of expatriation, and thus lose American nationality or citizenship.

&ast; &ast; &ast; &ast; &ast; &ast;

"At all times therefore since the effective dates of the various provisions of § 401 of the Nationality Act of 1940—that is to say, since January 13, 1941 with respect to subsections (a) to (h) inclusive, since July 1, 1944 with respect to subsection (i), and since September 27, 1944 with respect to subsection (j)—a born American citizen desiring to lose or terminate or discontinue American nationality or citizenship was required by our law to do voluntarily—of free will—one or more of the acts specified in subsections (a) to (j) inclusive of § 401, thereby evidencing an intention to renounce or abandon American nationality and with it allegiance to the United States.

"When American citizenship is thus renounced or abandoned, all rights and privileges, as well as all duties and obligations, of that citizenship thereupon cease.

"And, as applied to this case, once expatriated, once American citizenship is renounced or abandoned—the former citizen cannot reacquire any right or privilege of American citizenship without first becoming naturalized. As stated before, the acquiring of American citizenship through naturalization proceedings is not involved in this case."

If the plain meaning of the language of § 408 of the Nationality Act of 1940, 8 U.S.C.A. § 808.—"The loss of nationality under this chapter shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this chapter"—can be said to admit of doubt as to legislative intention, that doubt in my view is entirely dissipated by the legislative history of the Act. See: Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 1947, 161 F.2d 860, 863–868; cf. Mackenzie v. Hare, 1915, 239 U.S. 299, 308–312, 36 S.Ct. 106, 60 L.Ed. 297; Leong Kwai Yin v. United States, 9 Cir., 1929, 31 F.2d 738, 740.

But even if it were an erroneous view of the law to tell the jury that "the acts specified from time to time in § 401 are the sole and exclusive methods whereby a born American citizen can exercise the right of expatriation, and thus lose American nationality or citizenship,"—the error must in the circumstances of this case be deemed academic and harmless.

The defendant testified that when he caused his name to be entered in a koseki tohon or family register in Japan, he believed that thereby he renounced or lost American citizenship. And the jury were instructed that: "As to any overt act or acts * * * which you may find to have been committed by the defendant, even though you also find the defendant was an American citizen, if you further find that at the time of such overt act or acts, if any, the defendant honestly believed that he was no longer a citizen of the United States, then the defendant could not have committed such overt act or acts with treasonable intent, and you must acquit him."

So the jury could not erroneously have convicted the defendant under the instructions given without finding that he did not honestly believe he was no longer a citizen of the United States, but had nonetheless somehow expatriated himself and was not aware of it! Thus the defendant's contention becomes ephemeral indeed when it is remembered that the whole burden of his testimony at the trial, and of his counsel's plea to the jury, was to the effect that, during the period when the acts of treason were alleged to have been committed, the defendant did honestly believe he was no longer an American citizen and hence owed no further allegiance to this country of his birth.

The final ground to be noticed is the contention that "The verdict was the result of coercion, compulsion and fear after the jury had announced that they were unable to arrive at a verdict."

Before retiring to deliberate, the jury were instructed as follows as to the forms of verdict:

"Before you may convict the defendant of the crime of treason charged, you must find from the evidence that the prosecution has proved beyond a reasonable doubt the eight essential elements of the charge in the manner required to be proved as previously explained in these instructions. The eight essential elements of the charge are:

"First: That during the period specified in the indictment, namely, August 8, 1944 up to and including August 24, 1945, the defendant was an American citizen owing allegiance to the United States;

"Second: That while an American citizen owing allegiance to the United States, the defendant cast his lot with and adhered to the enemies of the United States, to wit, the Government of Japan, with the intent to betray the United States;

"Third: That while so adhering to the enemies of the United States, the defendant committed one or more of the overt acts alleged in the indictment, and submitted for your consideration, and proved by the direct testimony of at least two witnesses to the whole of the same overt act;

"Fourth: That the overt act or acts so committed by the defendant actually gave aid and comfort to the enemies of the United States, to wit, the Government of Japan;

"Fifth: That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted knowingly, intentionally, wilfully, unlawfully and feloniously;

"Sixth: That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted traitorously and treasonably,

and for the purpose and with the intent to betray the United States and to adhere to, and give aid and comfort to the enemies of the United States, to wit, the Government of Japan;

"Seventh: That such overt act or acts of treason were so committed by the defendant at and near Camp Oeyama on the Island of Honshu, Japan, outside the jurisdiction of any particular state or district of the United States; and

"Eighth: That the Southern District of California is the district of the United States wherein the defendant was thereafter first found and apprehended.

"As stated before, the burden is upon the prosecution to prove beyond a reasonable doubt every one of these eight elements as charged. If the evidence fails to convince the jury beyond a reasonable doubt with respect to any of these eight elements, the jury must acquit the defendant.

\*    \*    \*    \*    \*    \*

"Upon retiring to the jury room, you will select one of your number to act as foreman. The foreman will preside over your deliberations and will be your spokesman in court.

"Thirteen forms of special verdict and a form of general verdict have been prepared for your convenience. You may take these forms to the jury room. I direct your attention first to the forms of special verdict.

"A form of special verdict has been prepared for each of the thirteen alleged overt acts submitted to you.[2]

\*    \*    \*    \*    \*    \*

"You will note that the eight specific interrogatories or questions asked as to each of the alleged overt acts submitted to you call for a 'yes' or 'no' answer covering each of the eight essential elements of the charge with respect to each alleged overt act.

"You are to give the unanimous answer of the jury to each of the eight questions set forth on each of the thirteen special verdicts. Your foreman will write the answer of the jury in the space provided opposite each question, and then date and sign each of the thirteen special verdicts.

"After you have completed your findings and have set them forth in your special verdicts, you will then consider your general verdict.

"The jury will remember at all times that the defendant cannot be guilty of treason for doing any overt act or acts alleged in the indictment and submitted for your consideration, unless you unanimously find from the evidence beyond a reasonable doubt the existence of the eight essential elements of the charge with respect to such overt act or acts; which is to say that, with respect to each of the thirteen overt acts charged in the indictment and submitted for your consideration, the defendant cannot be guilty unless you unanimously find 'yes' to be the true answer to each of the eight interrogatories asked on the form of special verdict dealing with the alleged overt act.

"So if your answer be 'no' to one or more or all of the eight questions asked as to each of the thirteen overt acts submitted to you, your general verdict must be 'not guilty.' On the other hand if, as to any one or more of the overt acts submitted to you, your answer be 'yes' to all of the eight questions asked, then your general verdict would be 'guilty.'

\*    \*    \*    \*    \*    \*

"When you have reached unanimous agreement as to your general verdict, you will have your foreman fill in, date and sign this form to show the general verdict —'guilty' or 'not guilty'—to which you unanimously agree.

"When you have completed and recorded your findings on the forms of special verdict, and have completed your general verdict, you will return with them into court.

"It is unnecessary of course to add the caution that nothing said in these instructions—nothing in the forms of general and special verdicts prepared for your convenience—is to suggest or convey in any way or manner any intimation as to what verdict I think you should find. Your verdict is

---

2. For form of special verdict, see 96 F.Supp. 851.

your sole and exclusive duty and responsibility."

The jury were also instructed as follows concerning the manner of their deliberations:

"The law of the United States permits the judge to comment to the jury on the evidence in the case. Such comments are only expressions of the judge's opinion as to the facts; and the jury may disregard them entirely, since the jurors are the sole judges of the facts.

\*       \*       \*       \*       \*       \*

"During the course of the trial, I have asked questions of certain witnesses. My object was to bring out in greater detail facts not then fully covered in the testimony. You are not to assume that I hold any opinion as to the matters to which the questions related. Remember at all times that you, as jurors, are at liberty to disregard all comments of the court in arriving at your own findings as to the facts.

\*       \*       \*       \*       \*       \*

"There is nothing peculiarly different in the way a jury is to consider the proof in a criminal case from that in which all reasonable persons treat any question depending upon evidence presented to them. You are expected to use your good sense; consider the evidence for only those purposes for which it has been admitted and give it a reasonable and fair construction.

"If the accused be proved guilty, say so. If not proved guilty, say so. Remember at all times that a defendant is entitled to acquittal if any reasonable doubt remains in your minds.

"Remember also that the question before you can never be whether the Government wins or loses the case. The Government always wins when justice is done, regardless of whether the verdict be guilty or not guilty.

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

"It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after a consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to change an opinion when convinced it is erroneous. But do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

"The attitude of jurors at the outset of their deliberations is important. It is seldom helpful for a juror, upon entering the jury room, to make an emphatic expression of opinion on the case or to announce a determination to stand for a certain verdict. When a juror does that at the outset, individual pride may become involved, and he or she may hesitate to recede from an announced position even when later shown it is not correct. You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth. You will make a definite contribution to the administration of justice if you arrive at an impartial verdict in this case.

"If it becomes necessary during your deliberations to communicate with the Court, do not indicate in any manner how the jury stands, numerically or otherwise, on the question of the guilt or innocence of the accused, until you have reached an unanimous verdict."

The case was submitted to the jury at 3:30 on Wednesday afternoon, August 25, 1948. The jury were taken to dinner at 5 P. M., returned at 6:50 P. M., and taken to their hotel for the night at 9:30 P. M. Jury deliberations on Wednesday thus consumed 4 hours and 10 minutes.

On Thursday, August 26th, the jury returned to the jury room at 9:40 A. M., requested the reading of certain testimony at 10:15 A. M.[3], were taken to lunch at 11:50 A. M., returned at 1:30 P. M., were taken to dinner at 6 P. M. and thence to their hotel for the night. The labors of the jury on Thursday thus consumed 6 hours and 40 minutes.

3. For Aug. 26, 1948 proceedings, see 96 F.Supp. 852.

On Friday, August 27th, the jury resumed deliberations at 9:30 A. M., were taken to lunch at 12:30 P. M., returned at 2:15 P. M., were taken to dinner at 6:15 P. M. and thence to their hotel for the night. Deliberations on Friday thus consumed 7 hours.

On Saturday, August 28th, the jury returned to the jury room at 9:30 A. M., were taken to lunch at 12:30 P. M., returned at 1:30 P. M. and at approximately 3 P. M. the foreman, a lawyer, sent by the bailiff a note reading: "The jury is unable to arrive at a verdict. A majority of the jury feel there is no probability of doing so."

Pursuant to stipulation of the parties the bailiff was instructed to advise the jury that the court desired them to deliberate further; and within a few minutes the jury sent a further note requesting to be relieved from further deliberations until Monday morning.[4]

By stipulation of the parties the jury were relieved from further deliberations until 9:30 on Monday morning, and were taken to their hotel at 4:08 P. M. on Saturday afternoon.

Before excusing the jury on Saturday, the court informed them "that the court's orders are that you be taken to luncheon or dinner or breakfast whenever you are ready, and that you be taken to the hotel to retire whenever you are ready." The jury's labors on Saturday consumed 5 hours and 38 minutes.

The jury rested from their deliberations throughout Sunday, August 29th. On Monday morning, August 30th, they returned to the jury room at 9:30, and the foreman sent the following communication to the court:

"The Foreman, personally, respectfully requests permission to approach the bench, or other similar action, for the reason of securing aid and advice of the Court, on a matter of procedure, concerning the proper deliberating of this jury. This matter is, in my belief serious and I am supported in that belief by other members of the jury.

The Court's consideration of this request will be appreciated, and of help.

"(Signed) Wm. W. Andrews,
Foreman."

The jury were then brought into open court where colloquy [5] between court and foreman and juror Mrs. Ziegler disclosed that personal or personality differences were hampering the deliberations. At length Mrs. Ziegler inquired: "Would it be out of form to have a new foreman?" To which the court replied: "You are entitled to elect your own foreman at any time."

The court then gave the jury certain supplemental instructions based upon those given by Judge Hoar in the Court of Common Pleas and approved by the Supreme Judicial Court of Massachusetts in Commonwealth v. Tuey, 1851, 8 Cush. 1, 62 Mass. 1, later modified by Circuit Judge Sanborn in United States v. Allis, C.C.E.D. Kan.1893, 73 F. 165, 182–183, affirmed 1894, 155 U.S. 117, 123, 15 S.Ct. 36, 39 L.Ed. 91, and later approved in Allen v. United States, 1896, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528.[6]

Following these proceedings on Monday morning, the jury retired to deliberate further, were taken to lunch at 12:05 P. M., returned at 1:30 P. M., were taken to dinner at 6 P. M. and thence to their hotel for the night. Their labors on Monday thus consumed 7 hours and 5 minutes.

On Tuesday morning, August 31st, the jury returned to the jury room at 9:20, and shortly after eleven sent the following communication:

"Your Honor: The Jury respectfully requests the Court's clarification of all the instructions."

"Respectfully submitted,
Elsie B. Nickel."

The jury were then returned into court for further instructions "on the special verdicts, and * * * the words 'betray' and 'felonious' * * *."[7] Although the jury made no statement on the subject, it

4. For Aug. 28, 1948 proceedings, see 96 F.Supp. 853.

5. For Aug. 30, 1948 proceedings, see 96 F.Supp. 853.

6. See post, p. 857.

7. For Aug. 31, 1948 proceedings, see 46 F.Supp. 857.

was plain from the fact that Mrs. Nickel was then acting as foreman that Mrs. Ziegler's fellow jurors had granted her wish— Mr. Andrews was no longer foreman.

After receiving further instructions on Tuesday morning, the jury of nine women and three men resumed deliberations with their new foreman, and were not heard from again until Thursday afternoon, when they returned their verdict.

On Tuesday the jury were 'aken to lunch at 12:05 P. M., returned at 1:25 P. M., were taken to dinner at 5:40 P. M. and thence to their hotel for the night. Their labors on Tuesday thus consumed 7 hours. On Wednesday, September 1st, the jury deliberated from 9:25 to 11:50 A. M., and from 1:20 to 5 P. M.—a total of 6 hours and 5 minutes; and on Thursday, September 2nd, from 9:20 A. M. to 12:05 P. M., and from 1:45 until 3:47 P. M.—a total of 4 hours and 47 minutes,—when the verdict was returned.

In the aggregate the labors of the jury consumed 48 hours and 25 minutes. The taking of testimony had extended over a period of two months. Some 60 witnesses had testified in person and by deposition, thus compiling some 5000 pages of transcript. Literally dozens of exhibits were received in evidence. The arguments of counsel consumed most of four days. There were submitted for consideration by the jury thirteen separate overt acts of alleged treason. And the jury were requested to answer 104 special interrogatories in reaching their verdict. See: Cramer v. United States, 1945, 325 U.S. 1, 36, note 45, 65 S.Ct. 918, 89 L.Ed. 1441.

No one can question either the magnitude or the gravity of the jury's task. To be sure, their labors extended over a period of nine days. But one of those days was a day of complete rest, and on no day except the first were deliberations carried on after dinner.

In United States v. Haupt, 7 Cir., 1945, 152 F.2d 771, 779, affirmed, 1947, 330 U.S. 631, 643, 67 S.Ct. 874, 91 L.Ed. 1145, the verdict withstood attack even though "the jury deliberated 28 hours without sleep." The jury in the case at bar never deliberated more than 7 hours and 5 minutes at any time without an intervening full night of rest.

In all the circumstances the duration of the jury's deliberations at bar was entirely reasonable. See Hyde v. United States, 1912, 225 U.S. 347, 383, 32 S.Ct. 793, 56 L.Ed. 1114; United States v. Sorcey, 7 Cir., 1945, 151 F.2d 899, 902, certiorari denied, 1946, 327 U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021; United States v. Olweiss, 2 Cir., 1943, 138 F.2d 798, 801, certiorari denied, 1944, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047; United States v. Novick, 2 Cir., 1941, 124 F.2d 107, 110, certiorari denied, 315 U.S. 813, 62 S.Ct. 795, 86 L.Ed. 1212, rehearing denied, 1942, 315 U.S. 830, 62 S.Ct. 913, 86 L.Ed. 1224; United States v. Rosso, 2 Cir., 1932, 58 F.2d 197; Bernal v. United States, 5 Cir., 1917, 241 F. 339, certiorari denied, 1918, 245 U.S. 672, 38 S.Ct. 192, 62 L.Ed. 540.

On Monday, August 30th, at the time the jury were given the supplemental instructions now complained of, they were admonished:

"When a situation like this is reached, the court tries to be of assistance to the jury. Frequently the position is made—and in many instances, perhaps, properly so— that the court is attempting to coerce the jury or to force the jury to arrive at a verdict.

"A verdict is desirable, but it is only desirable if it is a true verdict. It is only a true verdict if it represents the individual judgment, the honest individual judgment of each juror.

\*     \*     \*     \*     \*     \*

"It is unnecessary for me to say again that the court does not wish any juror to surrender his or her conscientious convictions. As I stated at the time the case was submitted to you, do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of other jurors, or for the mere purpose or arriving at a verdict.

\*     \*     \*     \*     \*     \*

"Let me repeat again so that you will not feel that any remarks I have made are intended to put any coercion or pressure upon you: No juror is expected to yield a con-

scientious conviction he or she may have as to the credibility of any witness or as to the weight or effect of any evidence, but, as I have previously said, it is your duty, members of the jury, to agree, unless after a full and impartial consideration of all the evidence with your fellow jurors, to agree would do violence to your individual judgment and conscience.

"There has been some suggestion here—there was Friday—that some of you were very tired. Perhaps I should have suggested to you at the outset that you may be as leisurely in your deliberations as the occasion and circumstances may require. Sometimes jurors may fail to agree because they hurry too much to try to agree. Sometimes people do that.

"I do not speak in any critical vein. We are dealing with an attempt to get 12 human beings to arrive at a common conclusion as to the truth.

"You will remember at all times if any doubt remains in your mind, any reasonable doubt as to the guilt, the defendant is entitled to your verdict of acquittal.

"The bailiffs have been instructed to take you to your meals whenever you wish to go, to take you to your hotel whenever you wish to go. You are to take all the time you may feel necessary for your deliberations.

"You may now retire and continue your deliberations as your good and conscientious judgment as reasonable men and women may determine.

\* \* \* \* \* \*

"It has been a long trial, as I say, and I know you are tired and you would like to be done with it. But in all the circumstances which have been mentioned here, I would ask you to deliberate further, to try further to see if you can't come to a unanimous agreement. If you can't answer all the questions, answer as many as you can. And remember, again, that no juror is expected to surrender his honest convictions if, after full deliberation and attention to the views of his or her fellow jurors, he or she remains convinced of the correctness of his or her stand on any matter involved."

When on Tuesday, August 31st, the jury returned with a new foreman and sought clarification of certain instructions, the court again admonished: "And you are the sole judges of the manner in which you shall proceed, and you are the sole judges, of course, of the weight and effect of all the evidence and the credibility of all the witnesses; and you are entitled to and should disregard all comments of the court which are at variance with your own conscientious judgment in the matter."

As the Supreme Court said in Hyde v. United States, supra, 225 U.S. at page 383, 32 S.Ct. at page 808: "It is hard to believe that with that admonition yet in their ears they bartered their convictions, \* \* \* were coerced by a threat of confinement to \* \* \* convict those who they were convinced were innocent."

The very suggestion that twelve men and women would unanimously agree to convict a defendant of treason—a capital offense and the most heinous of crimes—merely because a trial judge kept them deliberating when they preferred the comforts of home seems an unwarranted affront to this most distinctively characteristic institution of our Anglo-American legal system.

Here was a jury composed of a Neisi Japanese, a Negro, and one or more men and women of English, Irish, Scotch, German, Scandinavian, Italian descent—a veritable cross section of America! Here was a jury whose very colloquies with the court demonstrate total freedom from coercion; twelve men and women who knew their duties and their solemn responsibilities, who were told and appreciated the fact that in this case they served as judges—"the judges of the facts."

Here was a jury which on Monday, hampered by personal differences, had been unable since the preceding Wednesday to find a unanimous answer to even one of the 104 interrogatories submitted to them, but thereupon selected a new foreman, renewed deliberations and by Thursday afternoon returned their verdict as to 8 overt acts with unanimous answers to 64 of the interrogatories.

It is doubtful whether the best trained and most experienced of psychologists could ever determine with any degree of certainty whether, and if so to what extent, a jury might have been coerced. But the sense and the decencies common to mankind suggest that, in a capital case at least, it might be possible to coerce a jury to acquit, but never to convict.

If the verdict here were coerced as the defendant contends, then it must be said that the jury convicted the defendant in order to be excused to go home. That thought suggests inquiry why, if led to convict the defendant only because they were in a hurry to go home, did the jury not bring in a verdict on only one overt act, as they were told they might do. It seems unlikely that, in their assumed haste, the jury would choose to answer 64 interrogatories after they had been instructed that answers to only 8 would suffice for a conviction.

Moreover the special verdicts themselves serve to rebut any reasonable doubt that the jury's findings were freely and fairly arrived at. The defendant was found guilty of overt acts (a), (b), (c) and (d). The jury were unable to agree as to overt acts (e) and (f). The defendant was found guilty of overt act (g). The jury were unable to agree as to overt act (h). The defendant was found guilty of overt acts (i), (j) and (k); and the jury were unable to agree as to overt acts (l) and (o).

■ Far from indicating coercion, it is my opinion that the time element involved, the daily hours of deliberation, the change of foreman on Monday, the absence of any hint or intimation on the part of any member of the jury that there existed the slightest desire to be discharged at any time from Monday until the jury returned into court with their verdict on Thursday afternoon, —all indicate that the jurors were taking their time as they should, and as the court had instructed them they might do. Furthermore, the factors just mentioned, and others above discussed, point to a calm, deliberate and conscientious consideration of the evidence with respect to each of the 13 overt acts charged, and a unanimous verdict voicing the considered opinion of each juror as to 8 of the overt acts, without surrender of the conscientious convictions of any of the jurors.

There has been no verdict in my experience where the actions of the jury more clearly showed both a full consideration of the evidence and a complete understanding of the problems involved. Even the personal friction marking the early part of the jury's deliberations gave emphasis to prior and subsequent indicia that the jury took to heart this instruction given at the outset:

"Early in our national life one of the greatest of our Chief Justices, John Marshall, wrote:

" 'As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made, a deliberate and temperate inquiry. Whether this inquiry be directed to the fact or to the law, none can be more solemn, none more important to the citizens or to the government; none can more affect the safety of both.' Ex parte Bollman, 1807, 4 Cranch 75, 8 U.S. 75, 124, 2 L.Ed. 554.

"The wise caution of the venerable Chief Justice is as timely today as it was in 1807."

The defendant was lawfully and fairly indicted, tried and convicted. There appears no basis in fact or law to acquit, arrest the judgment, or order another trial.

■ The presumption of innocence, with which our common-law system of justice clothed the defendant throughout the trial, ceased when the jury returned their unanimous verdict of "Guilty." That verdict being fully supported by the evidence, the law now presumes the facts to be as the jury found them.

Born in America, reared in America, educated in the public schools of America, the defendant, like the classic traitor of all time, "was numbered with us" [Acts 1:17.] He had lived most of his life among us; had been fed by our land; had been nurtured by our institutions; had enjoyed the privileges of American citizenship. Exercising one of the privileges of that citizenship, he went to Japan in 1939 under the protection of an American passport.

After almost two years in Japan, the defendant renewed his American passport and

at that time made solemn oath to support and defend the Constitution of the United States against all enemies foreign and domestic and to bear true faith and allegiance to the same; and further swore that he took this obligation freely, without any mental reservation or purpose of evasion.

Following Pearl Harbor, the defendant was caught in the maelstrom of war between the United States and Japan. His allegiance was claimed by both countries. Because born the son of Japanese nationals, he was a Japanese subject according to the law of Japan. Because born on American soil, he was an American citizen by birth according to our law. But the defendant was not a poor illiterate who knew not what to do. Graduate of an American high school and a Japanese university, he was trained in the language and customs of both countries. The documentary evidence here shows that in 1942 and 1943 at Meiji University, Tokyo, he was graded "good" in "civil law" and "commercial law," and "excellent" in "outline of law," "controlled economy," "military training," and "maneuvers."

It has always been comparatively easy to acquire American citizenship, and even easier to lose it. The right of expatriation is declared by our law to be "a natural and inherent right of all people". 8 U.S.C.A. § 800. The defendant knew these things. He knew it was his unquestioned right to renounce at any time all duty of allegiance to this country. But he also knew that if he cast off his allegiance to the United States, he would at that moment lose all the rights and privileges of an American citizen.

The United States Supreme Court has said "it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance." Schneiderman v. United States, 1943, 320 U.S. 118, 122, 63 S.Ct. 1333, 87 L.Ed. 1796.

Affidavits and other documents submitted by him to the American Consul at Yokohama after the Japanese surrender show that—far from renouncing American nationality during his sojourn in Japan—the defendant avoided any act of record which would result in loss of his American citizenship.

In 1940 the defendant registered in Japan as an American citizen under the Japanese Alien Registration Law. But he made no record of his Japanese parentage in the Japanese census register until 1943—after he had passed the military age for conscription in Japan. Then he entered gainful private employment with a Japanese mining company at Oeyama. As interpreter for the company he was selling knowledge of the English language which he had gained in the public schools of America. But unlike his fellow American, Fujizawa, the defendant was not content with doing only what his duties as interpreter required of him. Instead, the defendant violated his oath of allegiance to the United States, transferred his loyalty to the enemy, and actively cast his lot with those then engaged in a life and death effort to destroy the country of his birth. The zeal with which the defendant practiced his treachery is witnessed in many ways, but perhaps most eloquently by the nicknames—"efficiency expert" and "empire builder"—given him by American prisoners of war at Oeyama.

The defendant was not, however, the kind of traitor who gives his all to some real or fancied cause espoused by an enemy. His devotion first and last was to Tomoya Kawakita. He wanted Japan to win the war, hoped and believed she would win, but feared she would not. If Japan won, he planned to return to the United States —as he boasted to American prisoners of war—and be a "big shot" because of his knowledge of the language and the people. But in the, to him remote, contingency that Japan might lose, the defendant determined to hold fast to his birthright—his American citizenship.

Thus his craven mind conceived that throughout the tragedy of the war he could contrive to be on each side in such a manner that neither would be the wiser. Evidently he believed the moral axiom— old in human experience when Christ preached it—that "No man can serve two masters * * *." [Matthew, 6:24; Luke 16:13]—did not apply to him.

By his own testimony, from March 1943 on to the end the defendant did everything he could to help Japan win the war. If the aid and comfort resulting from his efforts weighed little in the decision, this is so only because his opportunity was limited, and not because his desire to help the enemy was slight. All traitors are not given the chance to commit treason in a grand manner. Means to commit the classic type of treason—to betray the United States in a dramatic fashion as did Benedict Arnold—were not available to the defendant. But his testimony at the trial leaves no doubt that he would willingly have blown up our Pacific fleet and disclosed to Japan the secrets of our atom bomb, if it had only been within his power to do so.

Like Hans Haupt, Haupt v. United States, 1947, 330 U.S. 631, 67 S. Ct. 874, 91 L.Ed. 1145, the defendant gave every aid and comfort to the enemy that he was able to give. And the evidence compels the conclusion that what the defendant was able to do, with his brutal, slave-driving tactics, added many tons of nickel ore to Japan's war effort that never otherwise would have been mined or smelted by American prisoners of war.

Morally treason is a crime of the mind and heart. The traitor's conscience tells him what he is. So it may have been in defiance of a sense of guilt and shame that the defendant asserted his rights as an American citizen soon after the surrender of Japan. Why he wished to return to the country which he hated remains his secret. Whatever the reason, he again swore the American's oath of allegiance, although he admittedly felt none; and procured a passport under the protection of the nation he so recently wished to see prostrate before her enemies. The affidavits he made to procure that American passport show clearly—both by what was said and by what was unsaid—that the defendant returned to our shores fully conscious of his guilt.

The motion in arrest of judgment is denied. The motion of the defendant for a judgment of acquittal and the alternative motion for a new trial are also denied.[8]

---

**1. Jury Instructions**

The full text of the instructions to the jury prior to commencement of deliberations follows:

No. 19,665 Criminal

In the District Court of the United States, Southern District of California, Central Division.

UNITED STATES OF AMERICA, Plaintiff, v. TOMOYA KAWAKITA, Defendant.

1

MEMBERS OF THE JURY:

It is now my duty to instruct you as to the law governing this case. It is your duty, as jurors, to follow the law as stated in the instructions of the Court and to apply the law so given to the facts as you find them from the evidence before you.

The jury must accept the instructions of the Court as comprising together a complete and correct statement of the law governing the case. Do not single out one instruction alone as stating the law, but consider the instructions as a whole.

Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in the instructions of the Court.

2

The law of the United States permits the judge to comment to the jury on the evidence in the case. Such comments are only expressions of the judge's opinion as to the facts; and the jury may disregard them entirely, since the jurors are the sole judges of the facts.

3

You are here for the purpose of trying issues of fact presented by the allegations in the indictment and the denial made by the plea of the accused. You are to perform this duty without bias or prejudice as to either party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The accused and the public expect that you will carefully and dispassionately consider all the evidence, follow the law as stated by the Court, and reach a verdict just to each side, regardless of what the consequences may be.

3–A

Early in our national life one of the greatest of our Chief Justices, John Marshall, wrote:

"As there is no crime which can more excite and agitate the passions of men than treason, no charge demands more from the tribunal before which it is made, a deliberate and temperate inquiry. Whether this inquiry

8. For proceedings upon pronouncement of sentence, see 96 F.Supp. 859.

be directed to the fact or to the law, none can be more solemn, none more important to the citizens or to the government; none can more affect the safety of both."

Ex Parte Bollman, 1807, 4 Cranch 75, 8 U.S. 75, 124, 2 L.Ed. 554.

The wise caution of the venerable Chief Justice is as timely today as it was in 1807.

4

An indictment is simply a legal accusation charging a defendant with the commission of a crime. It is not evidence of any kind against the accused, and does not create any presumption or permit any inference of guilt.

5

A defendant is presumed to be innocent of any crime. This presumption of innocence continues throughout the trial, and has the weight and effect of evidence in the defendant's behalf. When you retire to the jury room to deliberate upon a verdict, you must consider the evidence in the light of this presumption.

The presumption of innocence is sufficient to acquit a defendant, unless the presumption is outweighed by evidence satisfying you beyond a reasonable doubt of the defendant's guilt.

6

A reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence in the case. It is rarely possible to prove anything to an absolute certainty.

6-A

A reasonable doubt exists whenever, after full and impartial consideration of all the evidence in the case, the jurors do not feel satisfied to a moral certainty that a defendant is guilty of the charge.

A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. The law does not impose upon a defendant the duty of producing any evidence. The burden is upon the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged. A defendant has the right to rely upon a failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution.

In order to establish proof beyond a reasonable doubt, the evidence must be such that you would be willing to act upon it in the most important of your own affairs. You are not to convict a defendant on mere suspicion or conjecture.

The requirement that a defendant's guilt be proved beyond a reasonable doubt is to be considered as included in each instruction given.

7

There are two types of evidence from which a jury may properly find a defendant guilty of an offense. One is direct evidence—such as the testimony of an eye witness. The other is circumstantial evidence—the proof of a chain of circumstances pointing to the commission of the offense.

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case.

7-A

In order to justify a verdict of guilty based in part upon circumstantial evidence, the facts in the chain of circumstances relied upon must be consistent with the guilt of the accused, and inconsistent with every reasonable supposition of innocence. If the facts and circumstances shown by the evidence are as consistent with innocence as with guilt, the jury should acquit the accused.

7-B

Where the crime charged is treason, there is an additional requirement stated in our Constitution that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." This added burden of proof upon the prosecution in treason cases will be explained in detail later in these instructions.

8

You, as jurors, are the sole judges of the credibility of the witnesses and the weight to which their testimony is entitled. A witness is presumed to speak the truth. However, this presumption may be outweighed by the manner in which the witness testifies, by the character of the testimony given, or by contradictory evidence. You should carefully scrutinize the testimony given, the motive and state of mind of each witness, and all the circumstances under which each witness has testified. Consider each witness's intelligence, demeanor and manner while on the stand, and the relation which he or she may bear to each side of the case. Consider also the manner in which each witness might be affected by the verdict, the extent to which, if at all, he or she is either supported or contradicted by other evidence, and every other matter in evidence that tends to indicate whether the witness is worthy of belief.

If you find that the presumption of truthfulness has been outweighed as to any witness, you will give the testimony of that witness such credibility, if any, as may be dictated by your judgment as reasonable men and women.

9

A witness may be impeached and discredited by contradictory evidence; or by evidence that at other times the witness has made statements which are inconsistent with the witness's present testimony.

If you believe any witness has been impeached, it is your exclusive province to give

the testimony of that witness such credibility, if any, as you may think it deserves.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

### 10

Section 632 of Title 28 of the United States Code [1948 Revised Criminal Code, 18 U.S.C.A. § 3481] provides that "in the trial of all indictments, informations * * * and other proceedings against persons charged with the commission of * * * offenses * * * in the United States courts * * * the person so charged shall, at his own request but not otherwise, be a competent witness. And his failure to make such request shall not create any presumption against him."

That is to say, a defendant is not compelled to take the witness stand and testify, and no presumption of guilt shall be raised and no inference of any kind shall be drawn from the failure of a defendant to testify.

### 10–A

A defendant, however, who wishes to testify, is a competent witness; and the defendant's testimony is to be judged in the same way as that of any other witness.

### 10–B

All testimony as to any statements or admissions alleged to have been made by a defendant outside of court should be considered with caution and weighed with great care.

### 11

Since the founding of our National Government, Article III, § 3 of the Constitution has provided as follows:

"Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

Likewise, since 1790, § 1 of the Criminal Code has in substance provided that:

"whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason".

### 11–A

The defendant, Tomoya Kawakita, is not charged with levying war against the United States, so it is not necessary to consider here that aspect of the crime of treason.

The alleged treason charged in the indictment is that the defendant adhered to the enemies of the United States, giving them aid and comfort in Japan.

### 11–B

More specifically, the charge set forth in the indictment is that between August 8, 1944 and August 24, 1945, at or near Camp Oeyama on the Island of Honshu in Japan, the defendant, Tomoya Kawakita, while a citizen of the United States and owing allegiance to the United States, did knowingly, intentionally, wilfully, unlawfully, feloniously, traitorously and treasonably adhere to the enemies of the United States, particularly the Government of Japan, with which the United States had been at war since December 8, 1941, giving aid and comfort to Japan in violation of his duty of allegiance to the United States. The indictment then describes the claimed manner and means whereby the defendant is alleged to have manifested his alleged adherence to the enemies of the United States.

In substance it is charged in the indictment that the defendant's claimed adherence to the enemies of the United States is shown by voluntary conduct of the defendant consisting of: (1) the defendant's alleged serving as an interpreter and foreman at a prisoner of war camp at Camp Oeyama and at an open pit ore mine and smelter nearby, and compelling members of the armed forces of the United States, who were then and there prisoners of war of the Japanese Government, to perform labor at the mine and the smelter; and (2) the defendant's alleged directing and assisting the Japanese military forces having charge of the prisoners of war at Camp Oeyama in the imposition of discipline and punishment on the members of the armed forces of the United States; and (3) the defendant's alleged beating, abusing and attempting to destroy the morale and the physical and mental well being of said members of the armed forces of the United States.

It is charged in the indictment that these claimed activities of the defendant just mentioned were intended by him to assist the Japanese military authorities to control and discipline members of the armed forces of the United States who were prisoners of war at Camp Oeyama, and to render them abjectly subservient; and were further intended by the defendant to assist the Japanese Government to utilize members of the armed forces of the United States to produce minerals, metals and products to be used in the manufacture of arms, materials and munitions of war for the Japanese Government.

It is then charged in the indictment that, while so adhering to the enemies of the United States, the defendant committed fifteen specific overt acts of treason at or near Camp Oeyama in Japan; and further that each of the fifteen overt acts alleged were done by the defendant for the purpose and with the intent to adhere to, and give aid and comfort to the enemies of the United States, particularly the Government of Japan; and that each of the fifteen overt acts alleged did give aid and comfort to the enemies of the United States, particularly the Government of Japan.

As you were advised earlier in the trial, two of the alleged overt acts—those designated as "M" and "N"—have been withdrawn, leaving the remaining thirteen to be submitted for your consideration.

## II–C

As already pointed out, the burden is upon the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged; and where the crime charged is treason, the Constitution imposes an added burden of proof upon the prosecution, which I shall explain to you shortly.

The essential elements of the offense charged in the indictment are found in the following allegations:

First: That the defendant, Tomoya Kawakita, at all times during the period specified in the indictment, namely, August 8, 1944, up to and including August 24, 1945, was an American citizen owing allegiance to the United States;

Second: That while an American citizen owing allegiance to the United States, the defendant did "adhere to the enemies of the United States and more particularly * * * the Government of Japan, with which the United States at all times since December 8, 1941, and during the time set forth in this indictment, has been at war * * * *", with the intent to betray the United States;

Third: That while so adhering to the enemies of the United States, the defendant committed one or more or all of the overt acts alleged in the indictment and remaining to be submitted for your consideration;

Fourth: That the overt act or acts so committed by the defendant actually gave aid and comfort to the enemies of the United States, to-wit, the Government of Japan;

Fifth: That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted knowingly, intentionally, wilfully, unlawfully and feloniously;

Sixth: That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted traitorously and treasonably, and for the purpose and with the intent to betray the United States and to adhere to, and give aid and comfort to the enemies of the United States, to-wit, the Government of Japan;

Seventh: That such overt act or acts of treason were so committed at and near Camp Oeyama, on the Island of Honshu, Japan, outside the jurisdiction of any particular state or district of the United States; and

Eighth: That the Southern District of California is the district of the United States wherein the defendant was thereafter first found.

## II–D

It may be helpful if you consider separately, in the order stated, the evidence as to each of the eight essential elements of the charge against the defendant as set forth in the indictment.

As you will recall, the first essential element is embodied in the allegation:

That the defendant, Tomoya Kawakita, at all times during the period specified in the indictment, namely, August 8, 1944 up to and including August 24, 1945, was an American citizen owing allegiance to the United States.

The Fourteenth Amendment to the Constitution of the United States provides that: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

Thus American citizenship may be acquired in only two ways: by birth and by naturalization. All persons born in the United States are American citizens. Any others who acquire American citizenship must do so by means of naturalization proceedings. The acquiring of American citizenship through naturalization proceedings is not involved in this case.

## II–E

It is stipulated here that the defendant was born at Calexico, California, on September 26, 1921, and thus became a born citizen of the United States.

Every born citizen and every naturalized citizen is termed a "national of the United States". The term "national" includes all persons owing permanent allegiance to the United States [8 U.S.C.A. § 501(a), (b)].

The phrase "permanent allegiance" refers to the duty of loyalty and obedience which every American citizen owes "to defend the Constitution and laws of the United States against all enemies, foreign and domestic," so long as he or she remains a citizen of the United States.

The terms "citizen," "subject" and "national" are used interchangeably in this case to denote a member of a sovereign state or nation who owes allegiance to such state or nation in return for protection received from such state or nation.

## II–E(1)

It is stipulated that the defendant's parents were born in Japan, and by reason thereof have always been Japanese nationals or subjects owing allegiance to Japan.

According to the law of Japan, the defendant himself, by reason of his Japanese parentage, was from birth a Japanese national or subject owing allegiance to Japan.

This conflict in the laws of the two countries gives rise to what is sometimes called "dual" nationality or citizenship; which means, as applied to this case, that the defendant became an American citizen upon birth, according to our law, because born in the United States; and also became a Japanese national upon birth, according to Japanese law, because of his Japanese parentage.

Under our law, any American citizen of alien parentage may, on becoming of age, renounce his American citizenship and thus become a citizen of only the country of his parents.

The question for you to determine on this phase of the case from all the evidence is whether or not at any time prior to or during the .period specified in the indictment, the defendant did renounce or abandon his American citizenship.

### II–E(2)

Questions as to whether or not a person is an American citizen and his or her duty of allegiance as such are determined in accordance with the law of the United States. But whenever our laws incorporate by reference or adopt the laws of another country, the foreign law thus adopted is to be considered the same as if a part of the law of the United States. What the foreign law is—in this case the law of Japan—is a question of fact to be determined by the jury from the evidence, the same as any other question .of fact.

### II–F

Under our law an American citizen cannot owe "permanent allegiance" to more than one country at any given time. That is to say, it is legally impossible for any American citizen to owe conflicting allegiance to any other country so long as he or she remains a citizen of the United States.

However, our law declares the right of expatriation to be "a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness * * *." [8 U.S.C.A. § 800]. Expatriation is the voluntary renunciation of one's citizenship—a voluntary act done with intent to renounce or forswear allegiance to the country of one's birth.

In order then to be relieved of the duty of allegiance imposed by American citizenship, one must do some voluntary act of renunciation or abandonment of American nationality and allegiance. And it is the policy of our law to permit free exercise of the right of expatriation by all American citizens everywhere.

### II–F(I)

In 1940 the Congress enacted and the President approved an act "to revise and codify the nationality laws of the United States into a comprehensive nationality code" known as the Nationality Act of 1940.

The Nationality Act of 1940 has been in effect since January 13, 1941.

### II–F(2)

Prior to the effective date of the Nationality Act of 1940, our law provided that any .American citizen could expatriate himself by doing any voluntary act which evidenced an intent to renounce or abandon American nationality and allegiance; but our law further provided: "That no American citizen shall be allowed to expatriate himself when this country is at war" [34 Stat. 1228].

When the Nationality Act of 1940 became effective, those provisions of our law were repealed; and at all times since January 13, 1941, American citizens have been permitted to expatriate themselves during wartime, but only in the manner provided by treaty or by the provisions of the Nationality Act of 1940.

### II–G

Section 401 of the Nationality Act of 1940 [8 U.S.C.A. § 801], in effect since January 13, 1941, provides that:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person: Provided, however, That nationality shall not be lost as the result of the naturalization of a parent unless and until the child shall have attained the age of twenty-three years without acquiring permanent residence in the United States: Provided further, That a person who has acquired foreign nationality through the naturalization of his parent or parents, and who at the same time is a citizen of the United States, shall, if abroad and he has not heretofore expatriated himself as an American citizen by his own voluntary act, be permitted within two years from the effective date of his Act to return to the United States and take up permanent residence therein, and it shall be thereafter deemed that he has elected to be an American citizen. Failure on the part of such person to so return and take up permanent residence in the United States during such period shall be deemed to be a determination on the part of such person to discontinue his status as an American citizen, and such person shall be forever estopped by such failure from thereafter claiming such American citizenship; or

"(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state * * *, if he has or acquires the nationality of such foreign state; or

"(d) Accepting, or performing the duties of, any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible; or

"(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory; or

"(f) Making a formal renunciation of nationality before a diplomatic or consular officer of the United States in .a foreign state, in such form as may be prescribed by the Secretary of State; or.

"(g) Deserting the military or naval forces of the United States in time of war, provided

he is convicted thereof by a court martial * * *; or

"(h) Committing any act of treason against, or attempting by force to overthrow or bearing arms against the United States, provided he is convicted thereof by a court martial or by court of competent jurisdiction; or

"(i) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense: or

"(j) Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the land or naval forces of the United States."

Subsection (i) was added to § 401 on July 1, 1944; and subsection (j) was added on September 27, 1944. So subsections (i) and (j) did not become effective until the dates just stated.

Any American citizen who does voluntarily any of the acts set forth in § 401, which I have just read, is thereby expatriated, and thus loses his or her American citizenship. Our law presumes that such action, voluntarily taken, evidences an intent to renounce or abandon allegiance to the United States, and with it of course American citizenship and all rights pertaining thereto.

### II–G(1)

Section 403 of the Nationality Act of 1940 [8 U.S.C.A. § 803], in effect since January 13, 1941, provides that:

"(a) Except as provided in subsections (g) and (h) of section 401, no national can expatriate himself, or be expatriated, under * * * section [§ 401] while within the United States or any of its outlying possessions, but expatriation shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in * * * section [§ 401] if and when the national thereafter takes up a residence abroad.

"(b) No national under eighteen years of age can expatriate himself under subsections (b) to (g), inclusive, of section 401."

When subsection (i) of § 401 added on July 1, 1944, § 403 was amended to include subsection (i) along with subsections (g) and (h) as exceptions to the rule stated in § 403.

### II–G(2)

Section 408 of the Nationality Act of 1940 [8 U.S.C.A. § 808] provides in substance that "loss of nationality * * * shall result solely from the performance by a national of the acts" specified in § 401 which I have read to

you. Section 410 provides that nothing in the Nationality Act of 1940 "shall be applied in contravention of the provisions of any treaty or convention to which the United States is a party upon October 14, 1940." There was no treaty or convention between the United States and Japan in effect October 14, 1940, which made any provision with respect to citizenship or expatriation.

As applied to this case, then, § 408 means that the acts specified from time to time in § 401 are the sole and exclusive methods whereby a born American citizen can exercise the right of expatriation, and thus lose American nationality or citizenship.

### II–H

At all times therefore since the effective dates of the various provisions of § 401 of the Nationality Act of 1940—that is to say, since January 13, 1941 with respect to subsections (a) to (h) inclusive, since July 1, 1944 with respect to subsection (i), and since September 27, 1944 with respect to subsection (j)—a born American citizen desiring to lose or terminate or discontinue American nationality or citizenship was required by our law to do voluntarily —of free will—one or more of the acts specified in subsections (a) to (j) inclusive of § 401, thereby evidencing an intention to renounce or abandon American nationality and with it allegiance to the United States.

When American citizenship is thus renounced or abandoned, all rights and privileges, as well as all duties and obligations, of that citizenship thereupon cease.

And, as applied to this case, once expatriated, once American citizenship is renounced or abandoned—the former citizen cannot reacquire any right or privilege of American citizenship without first becoming naturalized. As stated before, the acquiring of American citizenship through naturalization proceedings is not involved in this case.

### II–I

At all times since January 13, 1940, § 402 of the Nationality Act of 1940 [8 U.S.C.A. § 802] has provided that:

"A national of the United States who was born in the United States * * * shall be presumed to have expatriated himself under subsection (c) or (d) of section 401, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state * * * and such presumption shall exist until overcome whether or not the individual has returned to the United States. Such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, or to an immigration officer of the United States, under such rules and regulations as the Department of State and the Department of Justice jointly prescribe. * * *"

In other words, when a born citizen of the United States remains for six months or longer in the foreign country of which either he or his parents shall have been a national according to the laws of such foreign country, such American-born citizen shall be presumed to have expatriated himself by entering or serving in the armed forces of such foreign country, if he has or thereby acquires the nationality of such foreign country, as provided in subsection (c) of § 401; or by accepting or performing the duties of some office, post, or employment under the government of such foreign country or a political subdivision thereof, for which only nationals of such foreign country are eligible, as provided in subsection (d) of § 401; and such presumption of expatriation shall exist until overcome or outweighed by evidence to the contrary, whether or not the individual has returned to the United States.

Even though you find that evidence was presented to an American consular officer in 1946 which satisfied him sufficiently to overcome the presumption of expatriation provided in § 402 of the Nationality Act of 1940 which I have just read, such evidence and such finding of the consular officer are not binding on you.

It is the duty of the jury, as triers of the facts in this case, to determine from all the evidence presented upon the trial whether or not this presumption of expatriation has been overcome or outweighed.

## II—J

If you find this presumption that the defendant expatriated himself—renounced or abandoned or otherwise lost his American citizenship—during his stay in Japan has not been overcome or outweighed by evidence, if any, of what the defendant said and did while in Japan and upon his return to the United States, and the other evidence in the case, you must acquit the defendant.

On the other hand, if you find from the evidence beyond a reasonable doubt that this presumption of § 402 of the Nationality Act of 1940, which I have just read to you, has been overcome or outweighed by the other evidence in the case, you should then determine whether or not, prior to or during the period from August 8, 1944 until August 24, 1945, the defendant voluntarily did any other act or acts specified in § 401 of the Nationality Act of 1940 [8 U.S.C.A. § 801], thereby renouncing or abandoning the status of American nationality and with it allegiance to the United States.

## II—K

Section 217a of Title 22 of the United States Code Annotated provides in part that:

"The validity of a passport or passport vise shall be limited to a period of two years: Provided, That a passport may be renewed under regulations prescribed by the Secretary of State for a period, not to exceed two years, upon payment of a fee of $5 for such renewal, but the final date of expiration shall not be more than four years from the original date of issue * * *."

## II—L

If you find from the evidence that the defendant voluntarily renounced or abandoned or otherwise lost his American citizenship or nationality prior to or during the period specified in the indictment, commencing August 8, 1944 and ending August 24, 1945, you must acquit the defendant, because the overt acts charged in the indictment, even if committed by him, could not constitute the crime of treason against the United States since his duty of allegiance ceased with termination of his American citizenship.

On the other hand, if you should find from the evidence beyond a reasonable doubt that during the period specified in the indictment the defendant was an American citizen, you must also find that he then owed the United States the same duty of allegiance as any other citizen.

As stated before, the defendant was at liberty during his stay in Japan to renounce or abandon his American citizenship and with it all duty of allegiance to the United States. But unless and until he did so, the defendant owed allegiance under our law to his native country, the United States.

So if you should find from the evidence beyond a reasonable doubt that during the period specified in the indictment the defendant remained an American citizen owing allegiance to the United States, it would be your duty then to consider the second essential element of the charge as set forth in the indictment.

## II—M

The second essential element of the charge is the allegation:

That while an American citizen owing allegiance to the United States, the defendant did "adhere to the enemies of the United States and more particularly * * * the Government of Japan, with which the United States at all times since December 8, 1941, and during the times set forth in this indictment, has been at war * * *", with the intent to betray the United States.

On the breaking out of war between the United States and Japan on December 7, 1941, the Government of Japan and all its subjects, citizens, departments, bureaus, agencies and agents became enemies of the United States; and all continued to be enemies at all times during the period specified in the indictment, namely between August 8, 1944 to and including August 24, 1945, because during this period the United States was at war with Japan.

The charge of adherence to an enemy is old in the law of treason. The expression is found in the ancient Treason Act of England from the year 1351. The expression "adhere to an enemy" means to break allegiance to one's own country by casting one's lot with the enemy—

to be disloyal in mind and heart to the cause of the country to which a person owes allegiance—to betray one's country by siding with her enemies.

Since adherence may consist in nothing more than a state of mind, evidence as to acts or happenings or events not charged in the indictment, which has been received for the sole and limited purpose of aiding the jury to determine the defendant's state of mind or intent during the period specified in the indictment, may be considered along with all other evidence in the case in determining whether or not the defendant did "adhere to the enemies of the United States and more particularly * * * the Government of Japan," as charged in the indictment.

If you find that during the period August 8, 1944 until August 24, 1945, the defendant did owe allegiance to this country, but did not adhere to the enemies of the United States, the crime of treason was not committed and you must acquit the defendant.

On the other hand, if you should find from the evidence beyond a reasonable doubt that, while owing allegiance to the United States, the defendant did adhere to the enemies of the United States, particularly the Government of Japan, it would be your duty then to consider the third essential element of the charge.

## II–N

The third essential element of the charge in the indictment is the allegation:

That while so adhering to the enemies of the United States, the defendant committed one or more or all of the overt acts alleged in the indictment and remaining to be submitted for your consideration.

Adherence to the enemy may consist in nothing more than a disloyal state of mind or heart—an intent to betray one's country. But adherence to the enemy in thought, in intellectual or emotional sympathy, without more, does not constitute the crime of treason.

Before the crime of treason is committed, treasonable acts must follow and unite with treasonable thoughts. The crime is not complete unless one or more acts—overt acts—of treason be committed.

An overt act is an act that is open to view—an act that may be seen or observed by others than the person acting; an act which actually gives aid and comfort to the enemy.

As you will recall, Article III, § 3 of the Constitution, which I have read to you, provides that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." There is no confession in open court involved here. So with respect to each of the overt acts charged in the indictment and remaining to be submitted for your consideration, the burden is upon the prosecution to produce at least two witnesses to the whole of the same overt act.

This requirement is an additional safeguard to those accused of the crime of treason. This is the added burden of proof which the Constitution imposes upon the prosecution in treason cases.

The two witnesses required for each overt act must be witnesses whose testimony gives direct evidence of the act. Direct evidence gives an eye-witness account—direct proof—of a fact, as distinguished from circumstantial evidence, which seeks to establish a fact by inference drawn from proof of other facts. Thus persons testifying to admissions, if any, claimed to have been made out of court, and other persons not giving eye-witness testimony as to one or more of the overt acts alleged in the indictment, may not be counted as "witnesses" in determining whether the constitutional requirement of testimony of two witnesses to the same overt act has been met.

Neither out-of-court admissions of the defendant, if any, nor the persons who may have testified to any admission of the defendant, may be counted as "witnesses" within the meaning of the constitutional requirement; and neither such admissions, if any, nor the persons testifying thereto, may be considered as either a total or partial substitute for or satisfaction of the constitutional requirement of "the testimony of two witnesses to the same overt act."

While two or more witnesses must testify to the same overt act, it is not required of course that their testimony be identical. Nor is it required that each witness testify to the whole of the act, since different witnesses may testify to different parts of the act. What is required is that, in order to establish an overt act of treason, the minimum proof necessary is that direct evidence of the overt act be given through the testimony of at least two witnesses, and that the jury be convinced beyond a reasonable doubt of the truth of such testimony.

Direct evidence of any overt act charged in this case would necessarily consist of the testimony of eye-witnesses who saw and heard the act done—saw the movement and heard the sound, if any, comprising the act. So the constitutional requirement is met only when, after considering the testimony given by all witnesses who testified as to an alleged overt act, the jury finds that the whole of such overt act—each movement and sound, if any, comprising the alleged act—is established as charged in the indictment by the testimony of at least two witnesses.

In order to convict the defendant of the crime of treason, it is not necessary that the prosecution prove every overt act alleged. But it is essential that at least one of the overt acts charged in the indictment and remaining to be submitted for your consideration be proved by the direct testimony of at least two witnesses, and be so proved in its entirety as alleged in the indictment.

If you find that the prosecution has failed to prove beyond a reasonable doubt the commission by the defendant of at least one of the overt acts in its entirety as charged in the indictment by "the testimony of two witnesses to the same overt act," you must acquit the defendant.

On the other hand, if you should find from the evidence beyond a reasonable doubt that, while owing allegiance to the United States and while adhering to the enemies of the United States, the defendant did commit one or more of the overt acts alleged, and that such act or acts have been proved in entirety as charged in the indictment, by "the testimony of two witnesses to the same overt act," it would be your duty then to consider the fourth essential element of the charge.

## II—O

The fourth essential element of the charge in the indictment is the allegation:

That the overt act or acts so committed by the defendant actually gave aid and comfort to the enemies of the United States, to wit, the Government of Japan.

An overt act may not serve as a basis for conviction of the crime of treason unless the act be treasonable in character. That is to say, the overt act must be an act which "really was aid and comfort to the enemy."

In the words of the United States Supreme Court in the case of United States v. Cramer, decided April 23, 1945, 325 U.S. 1, 34, 65 S.Ct. 918, 934, 89 L.Ed. 1441:

"The very minimum function that an overt act must perform in a treason prosecution is that it show sufficient action by the accused, in its setting, to sustain a finding that the accused actually gave aid and comfort to the enemy."

Thus the character of the overt act must be judged in its setting, in the light of any related facts and events, in the light of all surrounding circumstances as shown by all the evidence. Overt acts of an apparently incriminating character, when judged in the light of related events, may turn out to be acts which were not of aid or comfort to the enemy. On the other hand, overt acts innocent on their face, when judged in the light of related events, may turn out to be acts which "actually gave aid and comfort to the enemy."

An overt act which strengthens or tends to strengthen the enemies of the United States in the conduct of war against the United States, is in law the giving of aid and comfort. So, also, an act which weakens or tends to weaken the power of the United States to resist or to attack the enemies of this country is in law the giving of aid and comfort.

Aid and comfort may be said to be given whenever the enemy is encouraged and his morale bolstered, as well as when munitions and supplies are furnished. Acts which "give the enemy heart and courage to go on with the war," even unsuccessfully, may be acts of aid and comfort.

## II—O(1)

In 1942 the United States and Japan entered into a binding agreement that the handling of all prisoners of the war in which both countries were then engaged would be governed by the Geneva Convention of 1929, a copy of which is in evidence.

## II—O(2)

It is the duty of all prisoners of war to obey the laws, rules and regulations in force in the country where they are detained.

While held by the enemy, prisoners of war are not of course amenable to the discipline of their own officers, but they are subject to discipline and punishment by the detaining power for violations of any law, rule or regulation of the detaining power.

## II—O(3)

If you find it to be shown beyond a reasonable doubt and by the direct testimony of two or more witnesses to the same overt act, that the defendant did commit one or more of the overt acts charged in the indictment and remaining to be submitted for your consideration, but also find that such overt act or acts were not such as "actually gave aid and comfort to the enemy," then the crime of treason was not committed, and you must acquit the defendant.

On the other hand, if you should find from the evidence beyond a reasonable doubt that, while owing allegiance to the United States and while adhering to the enemies of the United States, the defendant did commit one or more of the overt acts charged in the indictment and remaining to be submitted for your consideration, and that one or more of the overt acts so committed "actually gave aid and comfort to the enemy," it would be your duty then to consider the fifth essential element of the charge.

## II—P

The fifth essential element of the charge in the indictment is the allegation:

That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted knowingly, intentionally, wilfully, unlawfully and feloniously.

In every crime there must exist a union or joint operation of act and intent. The burden is always upon the prosecution to prove both act and intent beyond a reasonable doubt.

## II—P(1)

As the United States Supreme Court said in the Cramer case previously mentioned, 325 U.S. at page 29, 65 S.Ct. at page 932:

" * * * the crime of treason consists of two elements: adherence to the enemy; and rendering him aid and comfort. A citizen intellectually or emotionally may favor the enemy

and harbor sympathies or convictions disloyal to this country's policy or interest, but so long as he commits no act of aid and comfort to the enemy, there is no treason. On the other hand, a citizen may take actions which do aid and comfort the enemy—making a speech critical of the government or opposing its measures, profiteering, striking in defense plants or essential work, and the hundred other things which impair our cohesion and diminish our strength—but if there is no adherence to the enemy in this, [and] if there is no intent to betray, there is no treason."

### II–P(2)

In prohibiting the enactment of laws abridging freedom of speech, our Constitution recognizes the right to speak critically of and to express intense dislike for any public official, be he a general of the army or the Commander in Chief. It is not charged here that any remark of the defendant, critical or otherwise, if he made such constitutes treason.

I repeat now the caution frequently given during the course of the trial: that evidence as to remarks or comments or statements made by the defendant, if any, has been received for the sole and limited purpose of aiding the jury to determine the state of mind or intent with which the defendant acted, if you should find from the direct testimony of two witnesses to the same overt act that the defendant did one or more of the alleged overt acts charged in the indictment and remaining to be submitted for your consideration.

### II–Q

You will note the indictment charges that the claimed overt acts of the defendant were done "knowingly, intentionally, wilfully, unlawfully and feloniously . . . ."

An act is done "knowingly" if done voluntarily and with guilty knowledge, and not because of mistake or inadvertence or other innocent reason.

An act is done "intentionally" if done voluntarily and purposely.

An act is done "wilfully" if done voluntarily and purposely and with the specific intent to violate the law.

"Unlawfully" means contrary to law. Hence to do an act "unlawfully" means to do intentionally something which is contrary to law.

"Feloniously" means with criminal intent and evil purpose. Hence to do an act "feloniously" means to do intentionally an unlawful act without color of right or excuse.

### II–R

A person is held to intend to do everything such person knowingly does in fact do. As stated before, an act is done knowingly if done voluntarily and with guilty knowledge, and not because of mistake or inadvertence or other innocent reason.

Intent may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be enabled to give direct evidence of acts of an accused, obviously no one can ever give an eye-witness account of the state of mind or intent with which such acts were done. What a defendant does or fails to do, however, may show intent or lack of intent to commit the offense charged.

You are not bound by a defendant's statements or declarations as to intent. On the contrary, you may find the mental state or intent of a defendant at a given time to be contrary to subsequent protestations or sworn declarations.

It is your duty to examine all the facts and circumstances in evidence which tend to shed light on intent.

### II–S

Intent and motive should never be confused. Motive is that which prompts a person to do an act. Intent refers only to the state of mind with which the act is done.

A good motive, even a laudable one, may prompt a person to commit a crime. Personal advancement and financial gain are two well recognized motives for much of human conduct. Those motives may prompt one person to voluntary acts of good, another to voluntary acts of crime.

Good motive is never a defense where the act done is a crime. If a person does intentionally an act which the law denounces as a crime, motive is immaterial.

### II–T

The element of intent, you will remember, is an essential element of every crime. With respect to lesser crimes, if it be shown that a person has voluntarily committed an act denounced by law as a crime, intent may be presumed from the mere doing of the forbidden act.

But in the case of major crimes, proof of specific intent to commit the particular crime is required before there can be a conviction. Specific intent, as the term suggests, means more than a mere general intent to commit the act.

Thus where the crime charged is treason, the burden is upon the prosecution to prove beyond a reasonable doubt not only that the defendant acted voluntarily, but also that he acted with treasonable intent—intent to give aid and comfort to the enemies of the United States, and to adhere to the enemies of the United States for that purpose.

In other words, alleged overt acts of aid and comfort must be intentional as distinguished from merely negligent or undesigned ones; and to commit treason a person must not only intend his overt acts, but must also intend to betray his country by means of such acts.

### II–U

If you find beyond a reasonable doubt and from the direct testimony of at least two wit-

nesses to the whole of the same overt act that the defendant, while owing allegiance to the United States, did commit one or more of the overt acts charged in the indictment and submitted for your consideration, your next duty would be to determine whether the act was committed voluntarily.

You will recall it has been stipulated that in January, 1944 the company operating the Oeyama mine and smelter was placed under control of the Government of Japan, and that commencing August 15, 1944 the defendant was forbidden by the law of Japan to cease working as interpreter there without permission of the Japanese Government.

As to any overt act or acts charged in the indictment and submitted for your consideration which you may find to have been committed by the defendant, if you further find that the defendant did not do the act or acts willingly or voluntarily, but so acted only because performance of the duties of his employment required him to do so or because of other coercion or compulsion, you must acquit the defendant.

On the other hand, if you should find from the evidence beyond a reasonable doubt that the defendant did not act under coercion or compulsion, but did voluntarily commit one or more of the overt acts charged in the indictment and submitted for your consideration, and in so doing acted knowingly, intentionally, wilfully, unlawfully and feloniously, as charged, your next duty would be to determine whether the defendant so committed such overt act or acts with treasonable intent.

### II–U(I)

The sixth essential element of the charge in the indictment is the allegation that in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted traitorously and treasonably, and for the purpose and with the intent to betray the United States and to adhere to and give aid and comfort to the enemies of the United States, to wit, the Government of Japan.

You will note the indictment charges that the claimed overt acts of the defendant were done traitorously and treasonably.

An act is done "traitorously" if done voluntarily and with the intent to betray the country to which allegiance is owing.

An act is done "treasonably" if done voluntarily with the intent to adhere to and give aid and comfort to the enemies of the country to which allegiance is owing.

### II–V

Thus intent to act traitorously and treasonably includes (1) specific intent to betray the United States, (2) specific intent to adhere to the enemy for the purpose of giving aid and comfort to the enemy, and (3) specific intent to give aid and comfort to the enemy.

### II–V(I)

As to any overt act or acts charged in the indictment and submitted for your consideration which you may find to have been committed by the defendant, even though you also find the defendant was an American citizen, if you further find that at the time of such overt act or acts, if any, the defendant honestly believed that he was no longer a citizen of the United States, then the defendant could not have committed such overt act or acts with treasonable intent, and you must acquit him.

### II–W

Since the intent or state of mind with which a person acts or fails to act cannot be shown by direct evidence, the constitutional requirement that the prosecution adduce "the Testimony of two Witnesses to the same overt Act" does not apply to the issue of intent. Unlike overt acts giving aid and comfort to the enemy, treasonable intent—specific intent to betray, specific intent to adhere to the enemy, and specific intent to give aid and comfort to the enemy—may be proved by circumstantial evidence.

You may infer the defendant's state of mind or intent from all the evidence in the case—including facts done and statements or admissions made by the defendant, if any, related facts and events, and all other surrounding circumstances shown by the evidence.

To paraphrase the language of the Supreme Court of the United States in the Cramer case, 325 U.S. at pages 31–32, 65 S.Ct. 918, 89 L.Ed. 1441.

What is designed in the mind of an accused never is susceptible of proof by direct testimony.

\* \* \* \*

Since intent must be inferred from conduct of some sort, it is permissible to draw usual reasonable inferences as to intent from the overt acts—and all surrounding circumstances. The law of treason, like the law of lesser crimes, assumes every man to intend the natural consequences which one standing in his circumstances and possessing his knowledge would reasonably expect to result from his acts. Proof that a citizen did give aid and comfort to an enemy may well be in the circumstances sufficient evidence that he adhered to that enemy and intended and purposed to strike at his own country.

As previously stated, in order to justify a verdict of guilty based in part upon circumstantial evidence, the facts in the chain of circumstances relied upon must be consistent with the guilt of the accused, and inconsistent with every reasonable supposition of innocence.

### II–X

If you find that the defendant did voluntarily commit one or more of the overt acts charged in the indictment and submitted for your consideration, and that such overt act or acts

"actually gave aid and comfort to the enemy," but further find that the defendant had no intent to adhere to or assist our enemies in their prosecution of the war, or to hamper the United States in its prosecution of the war, then the defendant did not act with treasonable intent, and you must acquit him.

On the other hand, if you should find from the evidence beyond a reasonable doubt that, while owing allegiance to the United States, the defendant, with treasonable intent, did adhere to the enemies of the United States, to wit, the Government of Japan, and did voluntarily commit one or more of the overt acts charged in the indictment and submitted for your consideration, and that such overt act or acts "actually gave aid and comfort to the enemy," and that in so doing the defendant acted knowingly, intentionally, wilfully, unlawfully, feloniously, traitorously and treasonably as charged, it would be your duty then to consider the seventh and eighth essential elements of the charge.

### 11–Y

The seventh and eighth essential elements of the charge set forth in the indictment are:

That such overt act or acts of treason were so committed at and near Camp Oeyama, on the Island of Honshu, Japan, outside the jurisdiction of any particular state or district of the United States; and that the Southern District of California is the district of the United States wherein the defendant was thereafter first found and apprehended.

The burden is upon the prosecution to prove beyond a reasonable doubt those facts in order to show that this court—the United States District Court for the Southern District of California—is the place provided by law for the trial of the defendant for the offense of treason charged.

Article III, § 2 of the Constitution of the United States provides that: "The Trial of all Crimes * * * shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

Pursuant to the power thus conferred by the Constitution, the Congress in 1790 enacted in substance what is today § 102 of Title 28 of the United States Code [1948 Revised Criminal Code, 18 U.S.C.A. § 3238], which provides that: "The trial of all offenses * * * committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

The crime of treason charged in the indictment, if committed by the defendant, was committed in Japan—"out of the jurisdiction of any particular state or district" of the United States.

There is no evidence that the defendant was "brought"—that is, carried or transported in custody—into any district of the United States. So in considering the seventh and eighth essential elements of the charge, the only issue for you to determine is whether or not the defendant was first "found" in this district—the Southern District of California—as charged in the indictment.

The words "district where the offender is found," as used in the statute, mean the district of the United States in which the defendant is first apprehended or arrested or taken into custody.

The Southern District of California covers generally the southern portion of the state, including the County of Los Angeles.

### 11–Z

The fact I have suggested that you consider the evidence as to the essential elements of the charge in a particular order or sequence is nothing more than a suggestion. As triers of the facts—as sole judges of the credibility of all witnesses and the weight and effect of all evidence—it is the exclusive province of the jury to determine in the course of deliberation the sequence in which the evidence in the case is to be considered.

### 12

In your consideration of the evidence you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw, from facts which you find have been proved, such inferences as seem justified in the light of your experience as reasonable men and women.

An inference is a deduction or conclusion which the reason of the jury makes from the facts proved, without any express direction of law to that effect.

A presumption is an inference or conclusion which the law requires the jury to make from particular facts in the absence of convincing evidence to the contrary. A presumption continues in effect until overcome or outweighed by evidence to the contrary; but unless so outweighed the jury are bound to find according to the presumption.

It is a presumption of the law that official duty was regularly performed.

### 13

You should distinguish carefully between what has been testified to by the witnesses and what has been stated by the attorneys. Statements and arguments of counsel are not evidence in the case.

However, when the attorneys have stipulated or agreed to certain facts, you are to regard such facts as conclusively proved.

### 14

You must consider only the evidence before you. That evidence consists of the sworn testimony of the witnesses, the exhibits which

have been received in evidence, all facts which have been stipulated or agreed to by counsel, and all applicable presumptions stated in these instructions.

Any evidence as to which an objection was sustained by the court, and any evidence which was ordered stricken by the court, must be entirely disregarded.

## 15

There are fifteen alleged overt acts of treason charged in the indictment. As I have previously advised you, alleged overt acts designated as "(m)" and "(n)" are withdrawn, "(m)" by the government and "(n)" by the court, from your consideration as possible acts of treason. So there are now submitted to you as possible acts of treason alleged overt acts designated as "(a)", "(b)", "(c)", "(d)", "(e)", "(f)", "(g)", "(h)", "(i)", "(j)", "(k)", "(l)" and "(o)" in the indictment.

## 15-A

The mere fact an alleged overt act is submitted as a possible act of treason does not carry any suggestion or intimation that the alleged overt act was or was not committed by the defendant, voluntarily or otherwise, or that the alleged overt act has been proved by the direct testimony of two witnesses or otherwise. Nor is it suggested or intimated, by submitting for your consideration an alleged overt act, that the overt act if committed actually gave aid and comfort to Japan in the conduct of its war against the United States. Nor is it suggested or intimated, if you should find an alleged overt act submitted for your consideration was voluntarily committed by the defendant which actually gave aid and comfort to the enemy, that such overt act was committed with treasonable intent. Whether or not the whole of an alleged overt act submitted to the jury for consideration has been proved by the direct testimony of at least two witnesses; and if so proved to have been committed by the defendant, whether or not the overt act was committed by the defendant knowingly, intentionally, wilfully, unlawfully, feloniously, traitorously and treasonably, as charged in the indictment; and whether or not the overt act, if so committed, actually gave aid and comfort to the enemy—all are questions of fact which it is the exclusive province of the jury to determine from all the evidence in the case.

Alleged overt acts "M" and "N" which have been withdrawn are to be treated the same as if never included in the indictment. Evidence as to the alleged overt acts which have been withdrawn is to be considered by you for the same limited purpose as evidence of other acts not alleged in the indictment.

As explained from time to time while evidence was being received, testimony or other evidence as to acts or happenings or events not charged in the indictment has been admitted for the sole and limited purpose of aiding the jury to determine from all related events—all the surrounding circumstances—the state of mind or intent with which the defendant acted, if the jury should find from the direct testimony of two witnesses to the same overt act that the defendant did one or more of the alleged overt acts charged in the indictment and now submitted for your consideration.

## 16

You have been cautioned that this is not a so-called "war crimes" trial—that the defendant is not on trial for maltreatment or deprivations suffered by American prisoners of war. It is not charged here that mistreatment or even cruelty to prisoners of war alone, if such occurred, constitutes the crime of treason. Nor is it claimed that the defendant is responsible for the conditions which existed generally in any Japanese prisoner of war camp. The defendant is not here sought to be charged with responsibility for any acts of others.

Before you may convict the defendant of the crime of treason charged, you must find from the evidence that the prosecution has proved beyond a reasonable doubt the eight essential elements of the charge in the manner required to be proved as previously explained in these instructions. The eight essential elements of the charge are:

First: That during the period specified in the indictment, namely, August 8, 1944 up to and including August 24, 1945, the defendant was an American citizen owing allegiance to the United States;

Second: That while an American citizen owing allegiance to the United States, the defendant cast his lot with and adhered to the enemies of the United States, to-wit, the Government of Japan, with the intent to betray the United States;

Third: That while so adhering to the enemies of the United States, the defendant committed one or more of the overt acts alleged in the indictment, and submitted for your consideration, and proved by the direct testimony of at least two witnesses to the whole of the same overt act;

Fourth: That the overt act or acts so committed by the defendant actually gave aid and comfort to the enemies of the United States, to-wit, the Government of Japan;

Fifth: That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted knowingly, intentionally, wilfully, unlawfully and feloniously;

Sixth: That in so adhering to the enemies of the United States, and in so giving aid and comfort to such enemies, the defendant acted traitorously and treasonably, and for the purpose and with the intent to betray the United States and to adhere to, and give aid and comfort to the enemies of the United States, to-wit, the Government of Japan;

**Seventh:** That such overt act or acts of treason were so committed by the defendant at and near Camp Oeyama on the Island of Honshu, Japan, outside the jurisdiction of any particular state or district of the United States; and

**Eighth:** That the Southern District of California is the district of the United States wherein the defendant was thereafter first found and apprehended.

As stated before, the burden is upon the prosecution to prove beyond a reasonable doubt every one of these eight elements as charged. If the evidence fails to convince the jury beyond a reasonable doubt with respect to any of these eight elements, the jury must acquit the defendant.

### 16–A

It would of course be a violation of your sworn duty, if you should find the defendant guilty because of some conduct personally offensive to you, but not constituting the crime of treason as charged in the indictment and defined in these instructions.

### 17

During the course of the trial, I have asked questions of certain witnesses. My object was to bring out in greater detail facts not then fully covered in the testimony. You are not to assume that I hold any opinion as to the matters to which the questions related. Remember at all times that you, as jurors, are at liberty to disregard all comments of the court in arriving at your own findings as to the facts.

### 18

It is the duty of the Judge to see that the trial is conducted with due regard to the rules of evidence and to the rules of procedure of the court. At times, counsel for both sides, in their zeal for their causes, may do something which is not in keeping with those rules. When this occurs, it is the duty of the Judge to admonish counsel, even without objection by the other side.

You are to draw no inference against the side to whom any admonition may have been addressed by the court, be it the prosecution or the defense.

### 19

The punishment which the law provides for the offense charged in the indictment is a matter exclusively within the province of the court, and should not be considered in your deliberations in any way.

### 20

There is nothing peculiarly different in the way a jury is to consider the proof in a criminal case from that in which all reasonable persons treat any question depending upon evidence presented to them. You are expected to use your good sense; consider the evidence for only those purposes for which it has been admitted and give it a reasonable and fair construction.

If the accused be proved guilty, say so. If not proved guilty, say so. Remember at all times that a defendant is entitled to acquittal if any reasonable doubt remains in your minds.

Remember also that the question before you can never be whether the Government wins or loses the case. The Government always wins when justice is done, regardless of whether the verdict be guilty or not guilty.

### 21

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after a consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to change an opinion when convinced it is erroneous. But do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

### 22

The attitude of jurors at the outset of their deliberations is important. It is seldom helpful for a juror, upon entering the jury room, to make an emphatic expression of opinion on the case or to announce a determination to stand for a certain verdict. When a juror does that at the outset, individual pride may become involved, and he or she may hesitate to recede from an announced position even when later shown it is incorrect. You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth. You will make a definite contribution to the administration of justice if you arrive at an impartial verdict in this case.

### 23

If it becomes necessary during your deliberations to communicate with the Court, do not indicate in any manner how the jury stands, numerically or otherwise, on the question of the guilt or innocence of the accused, until you have reached an unanimous verdict.

### 24

Upon retiring to the jury room, you will select one of your number to act as foreman. The foreman will preside over your deliberations and will be your spokesman in court.

Thirteen forms of special verdict and a form of general verdict have been prepared for your convenience. You may take these forms to the jury room. I direct your attention first to the forms of special verdict.

A form of special verdict has been prepared for each of the thirteen alleged overt acts submitted to you.

[Form of special verdict is read.]

You will note that the eight specific interrogatories or questions asked as to each of the alleged overt acts submitted to you call for a "yes" or "no" answer covering each of the eight essential elements of the charge with respect to each alleged overt act.

You are to give the unanimous answer of the jury to each of the eight questions set forth on each of the thirteen special verdicts. Your foreman will write the answer of the jury in the space provided opposite each question, and then date and sign each of the thirteen special verdicts.

After you have completed your findings and have set them forth in your special verdicts, you will then consider your general verdict.

The jury will remember at all times that the defendant cannot be guilty of treason for doing any overt act or acts alleged in the indictment and submitted for your consideration, unless you unanimously find from the evidence beyond a reasonable doubt the existence of the eight essential elements of the charge with respect to such overt act or acts; which is to say that, with respect to each of the thirteen overt acts charged in the indictment and submitted for your consideration, the defendant cannot be guilty unless you unanimously find "yes" to be the true answer to each of the eight interrogatories asked on the form of special verdict dealing with the alleged overt act.

So if your answer be "No" to one or more or all of the eight questions asked as to each of the thirteen overt acts submitted to you, your general verdict must be "not guilty." On the other hand if, as to any one or more of the overt acts submitted to you, your answer be "yes" to all of the eight questions asked, then your general verdict would be "Guilty."

[Form of general verdict is read.]

When you have reached unanimous agreement as to your general verdict, you will have your foreman fill in, date and sign this form to show the general verdict—"guilty" or "not guilty"—to which you unanimously agree.

When you have completed and recorded your findings on the forms of special verdict, and have completed your general verdict, you will return with them into court.

It is unnecessary of course to add the caution that nothing said in these instructions—nothing in the forms of general and special verdicts prepared for your convenience—is to suggest or convey in any way or manner any intimation as to what verdict I think you should find. Your verdict is your sole and exclusive duty and responsibility.

---

2. Form of Special Verdict as to Alleged Overt Act "(b)" which is typical of the thirteen forms of special verdict submitted to the jury, follows:

IN THE DISTRICT COURT OF THE

UNITED STATES

SOUTHERN DISTRICT OF CALIFORNIA

CENTRAL DIVISION

UNITED STATES OF AMERICA,
　　　　　　Plaintiff,
　　v.
TOMOYA KAWAKITA,
　　　　　　Defendant.

No. 19665 Criminal

SPECIAL VERDICT
AS TO
ALLEGED OVERT ACT
"(b)"

We, the jury in the above entitled cause, unanimously find as follows:

| Interrogatory | Finding of the Jury |
|---|---|
| (1) During the period specified in the indictment, namely, August 8, 1944 up to and including August 24, 1945, was the defendant, Tomoya Kawakita, an American citizen owing allegiance to the United States, as charged in the indictment? | ["YES" or "NO"] |
| (2) Did the defendant, while an American citizen owing allegiance to the United States, cast his lot with and adhere to the enemies of the United States, to wit, the Government of Japan, with the intent to betray the United States, as charged in the indictment? | ["YES" or "NO"] |

(3) Has it been proved by the direct testimony of at least two witnesses that the defendant, while an American citizen owing allegiance to the United States, and while adhering to the enemies of the United States, did commit the whole of the overt act alleged as "(b)" in the indictment, which reads as follows:

"Defendant Tomoya Kawakita, during the latter part of April, 1945, the exact date of which is to the grand jury unknown, at said Camp Oeyama did direct and participate in the following inhuman and degrading punishment of one, J. C. Grant, a member of the armed forces of the United States who was then and there a prisoner of war at said Camp Oeyama: said J. C. Grant was knocked into the drain or cesspool of said camp by his Japanese guards and was repeatedly and violently struck and beaten by the defendant and the said Japanese guards as he attempted

to get out of the pool, thereby sustaining injuries, shock and exposure."

["YES" or "NO"]

(4) If committed by the defendant, was overt act "(b)" actually of aid and comfort to the enemies of the United States, to wit, the Government of Japan, as charged in the indictment?

["YES" or "NO"]

(5) If, while an American citizen owing allegiance to the United States, the defendant did adhere to the enemies of the United States, and while so adhering did commit overt act "(b)", and if overt act "(b)" actually gave aid and comfort to the enemy as charged in the indictment, did the defendant, in so adhering to the enemies of the United States and in so committing overt act "(b)", do so knowingly, intentionally, wilfully, unlawfully and feloniously, as charged in the indictment?

["YES" or "NO"]

(6) If, while an American citizen owing allegiance to the United States, the defendant did adhere to the enemies of the United States, and while so adhering did commit overt act "(b)", and if overt act "(b)" actually gave aid and comfort to the enemy as charged in the indictment, did the defendant, in so adhering to the enemies of the United States and in so committing overt act "(b)", do so traitorously and treasonably, and for the purpose and with the intent to betray the United States and to adhere to, and give aid and comfort to the enemies of the United States, to wit, the Government of Japan, as charged in the indictment?

["YES" or "NO"]

(7) If the finding of the jury be "Yes" in response to each of the foregoing interrogatories (1) to (6) inclusive, did the defendant commit overt act "(b)" at or near Camp Oeyama, on the Island of Honshu, Japan, as charged in the indictment?

["YES" or "NO"]

(8) If the finding of the jury in response to Interrogatory (7) be "Yes", was the defendant thereafter first found in this district of the United States, the Southern District of California, as charged in the indictment?

["YES" or "NO"]

Los Angeles, California.
August ————, 1948.

Foreman of the Jury

[See: Cramer v. United States, 1945, 325 U.S. 1, 36, note 45, 65 S.Ct. 918, 89 L.Ed. 1441.

3. The proceedings then had in open court are reported in material part as follows:

Thursday, August 26, 1948, 10:15 A.M.

[41 R. 5588]:

Mr. Carter: Ready for the Government.

Mr. Lavine: Ready for the defendant.

\* \* \* \*

The Court: The bailiff has brought me a note from the jury which reads as follows: "Some of the Jurors wish to refer to the testimony, but do not remember just where to look therefore would like the entire transcript. (Signed) Wm. W. Andrews, Foreman."

\* \* \* \*

Mr. Lavine: Would your Honor instruct the Marshal to tell them that they should send a note down as to the subject matters that they would like to refer to?

[41 F. 5589]:

Mr. Carter: The names of the witnesses, if they recall; if not, the general subject matter; and if the name of the witness, the subject matter also. They can remember it in one form or the other, I am sure.

Mr. Lavine: That would be agreeable.

The Court: Mr. Bailiff, you will inform the foreman that if he will specify the testimony, either by the name of the witness or by reference to the general subject matter, or both, then we will endeavor to locate the transcript that they desire.

\* \* \* \*

The Court: The bailiff has just handed me a further communication from the jury which reads as follows:

"Marie Ziegler wishes the transcript of the testimony of Fujisawa.

"Margaret Umbarger wishes the transcript of the testimony of Kawakita.

"Gertrude Shoemaker wishes the transcript of the

[41 R. 5590]:

testimony of Montgomery on the subject of Overt Act B, as alleged. (Signed) Wm. W. Andrews, Foreman."

\* \* \* \*

Mr. Carter: I have never heard of sending a transcript in to the jury room.

Mr. Lavine: No. I think we will have to have them come down and have it read, your Honor.

The Court: Yes; let the reporter read it from the transcript.

\* \* \* \*

[Thereupon the jury were brought into open court and the testimony was read by the reporter.]

[41 R. 5595]:

Foreman Andrews: If your honor please, Mrs. Umbarger has stated she does not wish to hear the testimony she formerly requested.

The Court: Has the jury heard now all the portions of the transcript they desire to have read at this time? * * * If you have heard what you desire to hear, you will now retire to the jury room for further deliberation.

(The jury retire from the courtroom.)

---

4. The proceedings then had in open court are report in material part as follows:

Saturday, August 28, 1948, 3:20 P.M.

[41 R. 5607]:

The Court: Ladies and gentlemen of the jury, the bailiff a few minutes ago brought a communication from your foreman which has been filed and which reads as follows:

"The jury is unable to arrive at a verdict. A majority of the jury feel there is no probability of doing so.

(Signed) Wm. W. Andrews, Foreman."

That communication was discussed with counsel, and in order to save you the inconvenience of coming here to hear the court's reply, the defendant and prosecution both stipulated that the court might instruct the bailiff to orally say to you what the court wished to say to you, namely, that the court wishes you to continue with your deliberations.

The bailiff has now returned with a further communication which reads as follows:

"The majority of the jury would appreciate a recess until Monday A. M.

(Signed) Wm. W. Andrews, Foreman."

I have discussed that communication also with counsel

[41 R. 5609]:

and both sides recognize, and I do, that this has been a long trial, and they are agreeable that you suspend your deliberations, if you desire to do so, until Monday morning and thereby get some rest, if you desire so to rest.

Of course, you will appreciate that you must be kept together. The law requires that, and you have heard the oaths that the bailiffs who have you in charge have taken.

Of course, there can be no communication by any of you with anyone from the outside relative to any matter involving this case. In other words, you are not to read any newspapers and, as I have told you before, you are not to communicate with anyone nor to permit anyone to communicate with you anything concerning this case unless you have a communication to send to the court through he bailiff.

* * * *

[41 R. 5610]:

Is there anything which either side would have me say further to the jury in connection with the matter?

Mr. Carter: Nothing further.

Mr. Lavine: Well, nothing in connection with that matter, unless your Honor desires to make further inquiries along the line of the first communication. That would be the only thing. It would be up to your Honor, because of the word used in there that your Honor had some doubt about.

The Court: As long as we are all agreed to take a recess and rest until Monday morning, we will do that at this time. I am sure that all counsel and all persons involved will be glad to rest in this case until Monday morning, as you are.

You may retire at this time, and pursuant to the agreement of the parties, you may suspend your deliberations until Monday morning at 9:30. You will be in the custody of the bailiffs who were sworn at the time the case was given to you, and you will be in their custody under the oath which you heard them make at that time.

You may retire.

(The jury retire from the courtroom.)

---

5. The proceedings then had in open court are reported in material part as follows:

Monday, August 30, 1948, 9:30 P.M.

[41 R. 5618]:

The Court: Members of the jury, I have received a further communication from the foreman which reads as follows:

"The Foreman, personally, respectfully requests permission to approach the bench, or other similar action, for the reason of securing aid and advice of the Court, on a matter of procedure, concerning the

[41 R. 5619]:

proper deliberating of this jury. This matter is, in my belief serious and I am supported in that belief by other members of the jury. The Court's consideration of this request will be appreciated, and of help.

(Signed) Wm. W. Andrews, Foreman."

Before anything is said I want to caution you again: The court is not interested until you have reached unanimous agreement in hearing anything about how the jury stands numerically or otherwise, as I told you at the time the case was given to you. So in anything that is said, I want to caution you against any statement of any kind as to how you stand numerically or in any other manner.

What is the question as to procedure?

The Foreman: Your Honor, it is my belief that we have a juror here who is impeding justice.

854

The Court: Now, I don't want to hear anything about it. That is indicating how you stand.

The Foreman: Your Honor, it is not—

The Court: It is a question of the procedure.

The Foreman: It does not indicate how we stand.

The Court: Very well. Perhaps I am too hasty.

The Foreman: There are other members. We are not 11 to 1 or anything else.

The Court: I don't want to hear anything about how you stand.

[41 R. 5620]:

The Foreman: I understand. Excuse me, please, your Honor.

The Court: Proceed, please, Mr. Foreman.

The Foreman: I believe that this juror is impeding justice, interfering with the course of this trial, and making it so that this jury will never and can never arrive at a verdict; and that we are kept there, not only unable to proceed, but with this person who is personally objectionable to some members of the jury.

The Court: Is that the question?

The Foreman: And we wish to know what to do.

The Court: Well, you have had a rest over the week end as you requested. I hoped that all of you would come back refreshed and ready to continue your labors today.

It is not helpful for jurors or any other people to criticize each other. I told you upon giving you the case your sole function here is the ascertainment of the truth from the evidence before you.

You are not partisans. You are judges—the judges of the facts. Your sole function is to determine the truth from the evidence—the truth as to the facts.

Now, you were given a number of questions to answer. Numerically, they are quite a goodly number, but you have seen, no doubt, from reviewing the forms of

[41 R. 5621]:

special verdicts handed you the eight questions asked as to each overt act are the same questions with respect to each overt act, that is, insofar as they apply to the various overt acts.

I suppose all of us are prone to think that when people do not agree with us that the other fellow is wrong. The purpose of instructing the jury to deliberate together is to have you receive each other's views and listen to them with due respect and regard for the other fellow. That is the American way.

We each have our points of view, and sometimes when we discuss the problem together with an open mind and fairly we reach an agreement; and that is why I said when the case was given to you the verdict must represent the individual judgment of each juror. Your verdict must be unanimous. But it is your duty to consult and deliberate with each other with a view to reaching an agreement if you can do so without violence to your individual judgment or conscience.

I am sure you all understand that from the instructions given. No juror is expected to surrender his or her conscientious convictions as to the credibility of witnesses or as to the weight of the respective evidence for the mere purpose of arriving at a verdict.

It is not for me to tell the jury how to deliberate or the order in which they are to deliberate. I am sure all of you are mindful of your duties, and I would suggest you now retire and deliberate further.

[41 R. 5622]:

The Foreman: May I be heard further, your Honor?

The Court: Yes.

The Foreman: I am in a peculiar position because I am one of the few lawyers probably who have ever been on a jury. I have been on juries years ago, I have been on juries during this term, and I think I know something about both sides of the jury, and we go as far as we can with anything.

When it comes to a point where a supposedly reasonable person or persons feel it is impossible to continue, then we speak. And I spoke Saturday, and I am not alone.

The Court: We do not want to hear what goes on in the jury room.

The Foreman: I understand. That was the message that I sent to your Honor: I am not alone.

I would appreciate if the jury were polled as to an opinion on this because, after all, we have some things to do. If we feel it is utterly impossible, it seems it is not required of us to do a useless act. And, as I say, there is a personal animosity there that could possibly be dangerous.

The Court: Well, can't you poll yourselves up in the jury room?

The Foreman: We have, your Honor.

The Court: It won't help to poll you on such a question as that. I don't even know the question you wish to be polled upon.

[41 R. 5623]:

The Foreman: We wish to be excused. We feel that we cannot arrive at a verdict and the jury has been polled.

Mr. Lavine: I now request that the jury be polled on that question, your Honor.

The Court: What question?

Mr. Lavine: Whether they feel it is impossible to reach a verdict.

Mr. Carter: One of the jurors indicated, raised his hand here a minute ago on some matter.

The Court: Was that you, Mr. Clancy?

Juror Clancy: I don't think there is any chance in the world for this jury to agree. We have been locked up five nights and five days and we have not accomplished a thing and we never will. There is animosity crept in and there is everything crept in.

The Court: Well, you have serious questions there to answer, ladies and gentlemen. There is indication or space provided for a "yes" or "no" answer to those questions. Are you to suggest you can't answer any of the questions?

Juror Clancy: Yes, your Honor.

The Foreman: That is the suggestion, your Honor. We have not answered any questions.

The Court: Are you suggesting to me that it is impossible for the jury to agree upon a single answer to any one of the 104 questions propounded?

[41 R. 5624]:

Juror Clancy: Yes.

The Foreman: Yes, your Honor.

Juror Sidle: Could I say a word, your Honor?

The Court: Well, if it is—yes; you may.

Juror Sidle: I have been on many juries. I understand—I think I understand the procedure. We proceeded as instructed and, with the knowledge that we have, to the best of our ability, we discussed it and all of that. In other words, we approached it from every angle. There isn't an angle that I can think of that could be approached that would bring about, as we feel, any positive result or agreement.

We agree and not agree, and we just can't get anywhere with a situation, in the slang phrase, "hung up." That is what we are up against.

Further, your Honor, we realize, every one of us realizes the importance and the time and energy that has been put into this situation. We realize, further, individually, that we owe all of our energy and all of our time to put forth in this in trying to arrive, and went at it from every angle, and it has gotten to the point where, personally, I feel that there is absolutely nothing can be done.

Of course, if the court has anything or could do anything to help—but I understand. I am still willing to go ahead as long as my energies will hold up.

[41 R. 5625]:

Mr. Lavine: May it please the court, in view of the statement of the three jurors I now again renew my motion to discharge the jury * * *.

The Court: The motion is denied * * *.

Mr. Lavine: I think anything else now would be in the nature of coercion. That is the ground of my motion.

The Court: Yes; I understand.

The court wishes to assist you in every way possible, ladies and gentlemen. Of course, as I have told you throughout the trial, you are the sole judges of the credibility of the witnesses and of the weight and effect of the

[41 R. 5626]:

evidence. You are the sole judges of how you shall deliberate, and while the court may keep you deliberating, the court can't make you deliberate. It is the old story: You can ride a horse to the water, but you can't make him drink.

When a situation like this is reached, the court tries to be of assistance to the jury. Frequently the position is made—and in many instances, perhaps, properly so—that the court is attempting to coerce the jury or to force the jury to arrive at a verdict.

A verdict is desirable, but it is only desirable if it is a true verdict. It is only a true verdict if it represents the individual judgment, the honest individual judgment of each juror.

Do you wish any further suggestions from the court?

The Foreman: I still insist, your Honor, that it is utterly impossible. Persons of ordinary and reasonable intelligence could discuss things and arrive at any point—

The Court: That was not my question. My question was: Do you want any further suggestions from the court?

The Foreman: I renew my request that the jury be dismissed, your Honor.

The Court: Who was it had up their hand? Mrs. Ziegler, do you have something?

Juror Ziegler: Perhaps not. May I, your Honor?

[41 R. 5627]:

The Court: Yes, you may.

Juror Ziegler: Would it be out of form to have a new foreman? Mr. Andrews has not been well over the week end and somebody else has not.

The Court: You are entitled to elect your own foreman at any time.

Juror Ziegler: That would not help any.

The Foreman: I might say that the lady nominated me for foreman, your Honor.

Juror Ziegler: Yes; I did.

The Court: Let us not get into that. These personalities do not have anything at all to do with the court, and these personal relationships sometimes are the things that keep us from being open-minded and arriving at a verdict.

The court wishes to suggest a few thoughts which you may wish to consider along with your consideration of the evidence and all the instructions previously given you.

This is an important case. The trial has been long and expensive. If you should fail to agree on a verdict, the case is left open and undecided. Like all cases, it must be disposed of sometime. There appears no reason to believe that another trial would not be equally long and expensive; nor does there appear any reason to believe that the case can be again tried any more exhaustively than it has been on the part of either side.

[41 R. 5628]:

Any future jury must be selected in the same manner and from the same source as you have been chosen. So there appears to be no reason to believe that the case would ever be submitted to twelve men and women more intelligent, more impartial, more competent to

decide it, or that more or clearer evidence could be produced on the part of either side.

As I told you at the time I instructed you, it is rarely possible to prove or disprove, either way—it is rarely possible to prove or disprove anything to an absolute certainty.

Upon brief reflection, the matters I have mentioned suggest themselves, of course, to all of us who have sat through this trial. The only reason they are mentioned is because some of them may have escaped your attention, which must have been fully occupied in your consideration of all the evidence up to this time. These are matters which, along with other and perhaps more obvious ones, remind us of the desirability that you give the jury's unanimous answer to the questions asked on the 13 forms of special verdict submitted, and that you unanimously agree upon a general verdict of guilty or not guilty if you can do so without violence to your individual judgment and your conscience.

It is unnecessary for me to say again that the court does not wish any juror to surrender his or her conscientious convictions. As I stated at the time the case was submitted to you, do not surrender your honest con-

[41 R. 5629]:

victions as to the weight or effect of evidence solely because of the opinion of other jurors, or for the mere purpose of arriving at a verdict.

As I said at the time, also, it is your duty as jurors, however, to consult with one another and to deliberate with a view of reaching an agreement if you can do so without violence to individual judgment.

Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence with your fellow jurors. And in the course of the deliberations you should not hesitate to change an opinion when convinced it is erroneous. And certainly a juror should never hesitate to change his opinion by reason of personalities, if * * * convinced from the evidence and from the arguments made in the jury room that the opinion * * * previously held is erroneous.

In order to bring 12 minds to unanimous results, you must examine the questions submitted to you with candor and frankness, and with a proper regard and deference to the opinion of each other. That is to say, in conferring together you should pay due attention and respect to each other's opinions and listen to each other's arguments with a disposition and open-minded—a disposition to be convinced.

If the much larger number of you are for a conviction, each dissenting juror should consider whether

[41 R. 5630]:

a doubt in his or her own mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors who have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

On the other hand, if a majority or any substantial number of you are for acquittal, the other jurors ought seriously to ask themselves again whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellows.

Mr. Lavine: Had your Honor concluded?

The Court: No. The court and the jury are here to come to a just and righteous result in this case. You are as anxious to reach that result, I know, as I am.

As I have stated to you before, you are not partisans. You are judges—judges of the facts and your sole purpose is to ascertain the truth as to the facts from the evidence, and in ascertaining the truth as to the facts you are the sole and exclusive judges.

You must know it by heart by now. You are the sole and exclusive judges of the credibility of the witnesses and the weight and effect of all the evidence, and in the performance of your duties you are entitled to disregard, disregard entirely, all comments of the court and counsel

[41 R. 5631]:

in reaching your own judgment and in making your own findings as to the truth as to the facts.

Let me repeat again so that you will not feel that any remarks I have made are intended to put any coercion or pressure upon you: No juror is expected to yield a conscientious conviction he or she may have as to the credibility of any witness or as to the weight or effect of any evidence, but, as I have previously said, it is your duty, members of the jury, to agree, unless after a full and impartial consideration of all the evidence with your fellow jurors, to agree would do violence to your individual judgment and conscience.

There has been some suggestion here—there was Friday—that some of you were very tired. Perhaps I should have suggested to you at the outset that you may be as leisurely in your deliberations as the occasion and circumstances may require. Sometimes jurors may fail to agree because they hurry too much to try to agree. Sometimes people do that.

I do not speak in any critical vein. We are dealing with an attempt to get 12 human beings to arrive at a common conclusion as to the truth.

You will remember at all times if any doubt remains in your mind, any reasonable doubt as to the guilt, the defendant is entitled to your verdict of acquittal.

The bailiffs have been instructed to take you to your meals whenever you wish to go, to take you to your hotel whenever you wish to go. You are to take all the time

[41 R. 5632]:

you may feel necessary for your deliberations.

You may now retire and continue your delib-

erations as your good and conscientious judgment as reasonable men and women may determine.

The Foreman: May I be heard further, your Honor? I think the court does not understand the point that I raise. No one here objects to which way any juror voted, but the manner and statements made indicate to us this long time that it is going to be utterly impossible to complete this. It is not—no one here objects to any way or which way.

The Court: I understand that, Mr. Andrews.

The Foreman: I was not trying to state how the jury stood. But there is one question—

The Court: But sometimes, when people differ with us, that affects our opinion of them, you know.

The Foreman: I understand that, but as time goes by, it seems to me that sufficient time has gone by. That is my personal opinion and I have a great hesitancy for returning to the jury room.

The Court: Well, Mr. Andrews, you are a lawyer. Let me suggest to you that maybe you are able to arrive at your conclusion in some of these matters more rapidly by reason of your legal training. It may be necessary for some of the others to catch up with you. [41 R. 5633]:

The Foreman: I am not alone, sir.

The Court: Well, that may be true, too.

Mr. Lavine: I again renew my request, your Honor, in view of that statement, to discharge the jury.

The Court: Do you have something further, Mrs. Ziegler? You raised your hand.

Juror Ziegler: I don't feel like going out under the circumstances; I really don't.

The Court: It is very difficult, ladies and gentlemen of the jury, for the court to feel that you have completed your deliberations to the extent that you could under the court's instructions and not be able to arrive at a unanimous answer to one of the 104 questions presented to you. That may be the case.

It has been a long trial, as I say, and I know you are tired and you would like to be done with it. But in all the circumstances which have been mentioned here, I would ask you to deliberate further, to try further to see if you can't come to a unanimous agreement. If you can't answer all the questions, answer as many as you can. And remember, again, that no juror is expected to surrender his honest convictions if, after full deliberation and attention to the views of his or her fellow jurors, he or she remains convinced of the correctness of his or her stand on any matter involved.

You may now retire.

6. This type of supplemental instruction has been approved by the Court of Appeals of each circuit.

E.g., Boston & M. R. R. v. Stewart, 1 Cir., 1918, 254 F. 14, 18; United States v. Dunkel, 2 Cir., 1949, 173 F.2d 506, 508; Shaffman v. United States, 3 Cir., 1923, 289 F. 370, 374–375; Lias v. United States, 4 Cir., 1931, 51 F.2d 215, 218, affirmed, 1931, 284 U.S. 584. 52 S.Ct. 128, 76 L.Ed. 505; Weathers v. United States, 5 Cir., 1942, 126 F.2d 118, certiorari denied, 1942, 316 U.S. 681, 62 S.Ct. 1267, 86 L. Ed. 1754; Israel v. United States, 6 Cir., 1925, 3 F.2d 743, 745; Paschen v. United States, 7 Cir., 1934, 70 F.2d 491, 503; Wright v. United States, 8 Cir., 1949, 175 F.2d 384, 388, certiorari denied, 1949, 338 U.S. 873, 70 S.Ct. 143; Shea v. United States, 9 Cir., 1919, 260 F. 807, 808; Speak v. United States, 10 Cir., 1947, 161 F.2d 562, 564; Bord v. United States, 1942, 76 U.S.App.D.C. 205, 133 F.2d 313, 315, certiorari denied, 1942, 317 U.S. 671, 63 S.Ct. 77, 87 L.Ed. 539.

In Bowen v. United States, 8 Cir., 1946, 153 F.2d 747, 751–752, certiorari denied, 1946, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611, the foreman sent a note to the court stating that the jury was positively deadlocked 11 to 1. The court then called in the jury and gave them the substance of Judge Hoar's classic instruction. The Court of Appeals approved the giving of such a supplemental instruction even under those circumstances.

7. The proceedings then had in open court are reported in material part as follows:
Tuesday, August 31, 1948, 11:20 A.M.
[41 R. 5641]

(The jury return into the court room.)

The Court: Ladies and gentlemen of the jury, I have received a further communication through the bailiff from you which reads:

"Your Honor:

"The Jury respectfully requests the Court's clarification of all the instructions.

"Respectfully submitted,
Elsie B. Nickel."

That is a pretty large order. Do you have any particular problems concerning which you desire further instructions, or are there any instructions which you do not understand which you would like to have me amplify?

[41 R. 5642]:

Juror Nickel: Yes. We would like to have something told them on the special verdicts, and if you could define further the words "betray" and "felonious," I think in particular those would be very helpful.

\* \* \* \* \* \*

The Court: And what is it you wish to know about the special verdicts?

Juror Nickel: Well, perhaps the order in which they should be voted on. It would be very helpful. \* \* \* [Discussion] [41 R. 5649]:

858

Mr. Lavine: * * * I wish your Honor would instruct the jury that they can take into consideration all of the instructions given to them; that the instructions are to be considered as a whole on any of these questions, including all of them that your Honor has given, including 11–V(1) or any others, and they can take them as a whole and consider them as a whole, and not merely limit them to the particular instructions as to the special verdicts.

The Court: Yes. I am glad you mentioned 11–V(1). That is an instruction that I think might well be mentioned here. That deals with the question of intent. So

[41 R. 5650]:

in the logical arrangement of the questions put to you in the forms of special verdict, it really comes down under question No. (6), but you may want to discuss it in connection with question No. (1). I do not know whether you remember this instruction by number, but I think you probably do. It has been mentioned several times. Instruction 11–V(1) reads as follows: "As to any overt act or acts charged in the indictment and submitted for your consideration which you may find to have been committed by the defendant, even though you also find the defendant was an American citizen, if you further find that at the time of such overt act or acts, if any, the defendant honestly believed that he was no longer a citizen of the United States, then the defendant could not have committed such overt act or acts with treasonable intent, and you must acquit him."

That brings me to this question of "betray." That is a word used in the opinion of the Supreme Court, you will remember, which I read to you. It is not used in any artistic or technical sense here. Perhaps we can get a better understanding of it by discussing it in connection with this instruction 11–V(1).

*    *    *    *    *    *

[41 R. 5651]

But let us consider the meaning of "betray" in connection with instruction 11–V(1). A person can't just accidentally be guilty of a crime such as treason, as I have explained to you. That is the reason that word "feloniously" was one of the words used in the indictment.

*    *    *    *    *    *

[41 R. 5655]

You will recall I read to you in the instructions a quotation, instruction 11–P(1)—a quotation from the United States Supreme Court in the Cramer case, which said:

" * * * the crime of treason consists of two elements: adherence to the enemy; and rendering him aid and comfort." [325 U.S. 1, 65 S.Ct. 932.]

Which is another way of saying, I take it, that you cast your lot and get on the enemy's side of the war; and secondly, you help him, you render him aid and comfort. And the court goes ahead to say:

"A citizen intellectually or emotionally may favor the enemy and harbor sympathies or convictions disloyal to this country's policy or interest,"—

In other words, he may be at heart on the other side. And you remember, some of you, during the first world war a great many so-called hyphenated Americans were accused of being at heart on the side of Germany at war. But the court said: "but so long as he commits no act of aid and comfort to the enemy, there is no treason."

There is no treason in thinking about it. In other words, no treason in sympathizing, no treason in rooting for the other side, so to speak. Then the court proceeds:

[41 R. 5656]:

"On the other hand, a citizen may take actions which do aid and comfort the enemy—making a speech critical of the government or opposing its measures, profiteering, striking in defense plants or essential work, and the hundred other things which impair our cohesion and diminish our strength—"

In other words, he may actually do a great many things that actually help out the other side, "but if there is no adherence to the enemy in this, (and) if there is no intent to betray, there is no treason."

*    *    *    *    *    *    *

As applied to this case here we get back to instruction 11–V(1). That is the reason I gave you that instruction. This defendant, even though he was technically a citizen of the United States, if he honestly believed, if he honestly believed that he was not, if he honestly believed that during the period covered by this indictment that he was not an American citizen, then he could not have betrayed this

[41 R. 5657]:

country because he did not believe he owed it any allegiance.

* * * You can't betray a country unless you owe it allegiance, and you can't intend to betray it unless you know you owe it allegiance; and if you honestly believe you do not owe it allegiance, you could not commit treason.

That is the reason I said in instruction 11–V(1): "If the defendant honestly believed that he was no longer a citizen of the United States, then the defendant could not have committed such overt act or acts with treasonable intent, and you must acquit him, because treasonable intent is the intent to betray, the intent to go back on the country to which you owe allegiance and to help out the other side."

That is the reason instruction 11–V, the immediate preceding instruction, says: "Thus intent to act traitorously and treasonably includes (1) specific intent to betray the United States, (2) specific intent to adhere to the enemy for the purpose of giving aid and comfort to the enemy, and (3) specific intent to give aid and comfort to the enemy."

*    *    *    *    *    *    *

[41 R. 5658]:

If a person has specific intent, if a person, first, knows that he owes allegiance to the United States, and he, knowing that, knowing that he is a citizen of the United States and that he owes his allegiance to the United States —if, knowing that, he deliberately casts his lot with the other side, adheres to the other side, and deliberately, intentionally, knowingly, wilfully, and feloniously, to use some of the adverbs we have just been discussing—* * * gives aid and comfort to the enemy, does acts which actually give aid and comfort to the enemy, with that state of mind, I would say, he had betrayed his country.

    \*    \*    \*    \*    \*    \*    \*

Are there any further questions?

Yes, Mr. Clancy.

Juror Clancy: Can the jury take a final vote on any or all of the overt acts before taking a final vote on questions (1) and (2)?

The Court: You may proceed as you desire. I do not know what you mean by "a final vote."

Juror Clancy: The last vote.

[41 R. 5659]:

The Court: You may proceed in any manner in which you desire. You may determine the order of your deliberations. If you want to take up the various overt acts and decide whether they were proved first, there is nothing to prevent you from doing so.

I suggested the order, as I told you in the instructions, in which you might consider the eight essential elements of the charge, thinking that that was the logical way to proceed and it might be the most helpful way in which to proceed. And what occurs to one mind may not occur to others and it may not appear to you that way at all. And you are the sole judges of the manner in which you shall proceed, and you are the sole judges, of course, of the weight and effect of all the evidence and the credibility of all the witnesses; and you are entitled to and should disregard all comments of the court which are at variance with your own conscientious judgment in the matter.

Are there any further instructions which either side would have me give to the jury?

Mr. Carter: No further instructions, your Honor.

    \*    \*    \*    \*    \*    \*    \*

[41 R. 5661]

The Court: Do you think I have made it clear?

Mr. Lavine: I think it is clear now. I think they have it clear now since our discussion.

    \*    \*    \*    \*    \*    \*    \*

The Court: * * * You may now retire.

(The jury retired from the courtroom.)

---

8. The proceedings had upon pronouncement of sentence are reported in material part as follows:

[43 R. 5830]

The Court: * * *

Is the defendant ready for sentence?

Mr. Lavine: Yes your Honor.

May it please the court, I have examined the probation officer's pre-sentence report * * *.

    \*    \*    \*    \*    \*    \*    \*

[43 R. 5851]

I believe, your Honor, that a fair disposition of this case in the way of a just sentence would do much to hearten our international relationship, as well as to give this defendant what, under the law, you feel that you wish to impose by way of punishment for his acts, remembering that he is a young man and has some hope that at some day in the future he may atone for the things of which he has been found guilty here—things that he feels that were occurrences in a foreign land, in a foreign camp, in a place where there was nothing for him to do but to do and to act just as he did under the circumstances that he then found himself.

    \*    \*    \*    \*    \*    \*    \*

[43 R. 5852]

And I say, your Honor, in a few moments I conclude my plea on behalf of this young man. I think that we are living in a state that has been regarded as hostile to the Japanese people by reason of the events and occurrences of a great war. We must be careful that those events do not so bias or prejudice us in the pronouncement of a judgment in this case as to be other than what is fair and just under the circumstances. And I submit Tomoya Kawakita's fate to your fair and just determination.

The Court: Tomoya Kawakita, you are now before the Court for sentence, having been convicted by unanimous verdict of the jury of the crime of treason against the United States as charged in the indictment. Our law provides that whoever is guilty of treason shall suffer death, or shall be imprisoned not less than five years and fined not less than $10,000.

What, if anything, have you to say at this time as to why the maximum punishment provided by law should not now be imposed upon you?

The Defendant: Your Honor, I am innocent of this charge. I never did commit and never would commit any treason against the United States.

As I was found guilty by the jury, I ask your Honor for mercy.

The Court: Anything further?

[43 R. 5853]

The Defendant: No, sir.

The Court: Does the United States Attorney have anything to say?

Mr. Carter: I would like to call your Honor's attention to one or two matters. I heard your Honor's summary of the facts of this case on denying the motions. I am in accord with your analysis of the matters.

It would be impossible to figure up mathematically the suffering that this defendant caused the two hundred and some odd American prisoners in this camp over a period of a year. But more important, as the jury's verdict shows, he betrayed his country. And, as your Honor pointed out, there is little difference between a small traitor and a big traitor. He was a traitor to the extent of his ability.

\* \* \* \* \* \* \*

And I want to point out, finally, that this defendant is stateless; that having been convicted of treason, he lost his American citizenship. From the investigation we made and the evidence that was produced at this trial, I think that he

[43 R. 5854]

renounced his Japanese citizenship effectively before he came back to the United States.

Therefore we do not have a situation where we can say: Imprison him for a few years and then deport him to Japan. I do not think he is deportable because, if this judgment is affirmed and becomes final, I think he will be a stateless person and not deportable out of this country.

The Court: You gentlemen have performed your duties in this case most diligently. So has the jury. And this is now my responsibility.

I want to make it perfectly clear that the sentence I impose here has no relation to any brutalities that may have been involved in this defendant's treatment of American prisoners of war. That is only an incident. So with any kindness that he may have shown them. It is only an incident.

The defendant stands here convicted of the crime of treason. The fact that he was born of Japanese nationals has nothing to do with it. My views would be the same no matter who he was.

Treason is the only crime, as has been said here several times, mentioned in our Constitution. The framers thought it of sufficient gravity to provide it as the only crime mentioned in the Constitution of the United States.

As I view this matter, it is not a question of whether the defendant kicked some American prisoner of war or a

[43 R. 5855]

dozen of them. His crime might be briefly put in two sentences. He said that from 1943 on he did everything he could to help the Japanese Government win the war.

The jury found that he owed a duty of loyalty at that time to the United States. So his crime cannot be considered, I take it, in terms of beating up someone, no matter how brutal. His crime is a crime against the country of his birth. His crime is not against a few American prisoners of war. His crime is against the whole people of this country where he was born and where he was fed and where he was educated.

Throughout history treason has always been the crime most abhorred by English-speaking peoples. The traitor has always been considered even worse than a murderer. And the distinction is based upon reason: for the murderer violates at most only a few, while the traitor violates all—all the members of his society, all the members of the group to which he owes his allegiance. The punishment inflicted by the common law—when traitors were publicly dragged to the place of execution and there drawn, quartered and beheaded—recalls the extreme odium which our forebears attached to the crime of betraying one's country. The penalty for murder was death; for treason, death with vengeance.

Today our law permits the life of a traitor to be spared.

[43 R. 5856]

As it has been truly said: "It is the essence of treachery that those who commit it would still be severely punished if the law forgot its duty to provide deterrents to crime and did not lay a finger on them." [West, The Meaning of Treason, p. 229 (1947).]

If the defendant were to go from this Court a free man, he would be condemned to live out his life in bitter scorn of himself. Haunting him to the end of his days would be the memory not only of his base treason against the land of his birth, but also of Sadao Munimori who won the Congressional Medal of Honor; of Privates First Class, Fumitaka Nagato and Saburo Tanamachi, who are buried with the American heroes of all time at Arlington National Cemetery; and the memory of almost seven hundred other boys of like American birthright, of like Japanese parentage, who stood the supreme test of loyalty to their native land, and gave up their lives that America and her institutions might continue to live.

These thoughts and others \* \* \* must tell the defendant that his life, if spared, would not be worth living. Considering the inherent nature of treason and the purpose of the law in imposing punishment for the crime, reflection leads to the conclusion that the only worth-while use for the life of a traitor, such as this defendant has proved himself to be, is to serve as an example to those of weak moral fibre who may

[43 R. 5857]

hereafter be tempted to commit treason against the United States.

It is the judgment of the Court, Tomoya Kawakita, that for the offense of treason against the United States of which you stand convicted by unanimous verdict by the jury, you, Tomoya Kawakita, shall suffer the penalty of death as prescribed by Section 1 of Title 18 of the United States Code, now 18 U.S.C.A. § 2381, at a time and place hereafter to be fixed by the Court in the Warrant of Execution. It is further adjudged that, as directed by the provisions of Section 3566 of Title 18 of

the United States Code, formerly 18 U.S.C.A. § 542, the judgment and sentence of death now imposed for the offense of treason against the United States shall be executed, and the penalty of death inflicted, by the administration of lethal gas to you, Tomoya Kawakita, in the manner prescribed by the laws of the State of California for that purpose, until you, Tomoya Kawakita, are dead.

It is further adjudged that you, Tomoya Kawakita, be now committed to the custody of the Attorney General of the United States and the United States Marshal for the Southern District of California as his authorized representative, for execution of this judgment and sentence of death as provided by Section 3566 of Title 18 of the United States Code, formerly 18 U.S.C.A. § 542. And may Almighty God have mercy on your soul!